JONES & a. *v.* CONCORD & MONTREAL RAILROAD & a.

An issue of new shares of stock on an increase of the capital of a corporation is a partial division of the common property, which can be taken from the original shareholders only by their consent or by legal process.

A contract of union of two railroad corporations, which determines with exactness the stockholders' proportional ownership of the capital of the new corporation, but does not provide for a different distribution of preferred stock afterwards issued, furnishes conclusive evidence that no different distribution was intended.

The right to an unequal distribution of preferred stock of a corporation among the stockholders is not established by the fact that different classes of stockholders under their charter and contract share unequally in the dividends derived from the net earnings.

A vote at the annual meeting of a corporation to increase the capital stock is unauthorized, if the notice for the meeting omits to state that it was called for that purpose.

BILL IN EQUITY, for an injunction restraining the defendant railroad and its directors from issuing the whole or any part of certain preferred stock, which the corporation at its annual meeting, held on the thirteenth day of October, 1891, voted to issue, and from distributing the same to all the classes of stockholders in proportion to their respective holdings. Other facts are sufficiently stated in the opinion.

*Oliver E. Branch, Charles H. Burns*, and *Charles B. Gafney*, for the plaintiffs. I. The notice of the annual meeting, at which the increase of stock was voted, stated the object of the meeting to be "to act on the report of the board of directors, to choose a board of directors for the ensuing year, and to transact any other business that may be brought before the meeting."

At that meeting, after the report of the board of directors had been laid upon the table, before any action was taken upon it, a vote was taken *viva voce*, which was declared by the president to be passed, by which the act authorizing the increase of the capital stock was accepted to the extent of $1,200,000, and empowering the directors to issue shares representing said increase to all classes of stockholders in proportion to their respective holdings at par, if the same could be done legally. The vote so declared was not a stock vote, but was taken *viva voce*. At this meeting the plaintiffs filed a written protest and objection to the proposed vote, on the ground that such increase and distribution would be inequitable, illegal, and in conflict with the contract of union, and also because no legal or sufficient notice of the proposed increase had been given to the stockholders, and that such proposed increase was unnecessary.

The notice of the annual meeting contained nothing that could fairly be construed into a sufficient warning that the act of the legislature authorizing an increase of the capital would be submitted for acceptance, or that action would be taken to increase it at that time. The notice contained the usual and long customary announcement that the meeting would be held "to act upon the report of the board of directors;" but because that report recommended the passage of a vote authorizing the issue of stock not exceeding 12,000 shares, the notice itself of the meeting was not thereby cured. The notice must be sufficient in and of itself. The report of the directors is not in any sense a part of the notice. It might or might not have been sent to or received by the stockholders. It might or might not have been read by them. It certainly was not published as a part of the notice; and if it was a part of the notice, why should it not have been published? No one reading the notice would be led to conclude, because the meeting would "act upon the report of the board of directors," that anything more was to be done in respect to that than is usually done at an annual meeting, or that under that usual and for-

mal language business so extraordinary and· fundamental as increasing the capital stock would be attempted. In the absence of any statutory requirements as to the form of a notice of a stockholders' meeting, it must be so specific and plain that any one of ordinary intelligence would know from reading it what business would be done. The common-law rule of what is reasonable would require that the notice should be definite enough to enable stockholders to act deliberately and intelligently. If it is reasonable that voters in town-meeting should have such notice of the subject-matters to be acted upon in town-meeting as will enable them to act deliberately and intelligently, it is just as reasonable that voters in a stockholders' meeting should have such notice of what is to be done. *Pittsburg* v. *Danforth*, 56 N. H. 272, 276.

But the defendants contend that, since Art. I of the by-laws of the defendant corporation provides that "Any business within the power of the corporation may be transacted at annual meetings, although the subject-matter thereof is not specified in the notice for the meeting; but no business shall be transacted at a special meeting excepting that of which the subject-matter is distinctly stated in the notice of the meeting," it was not necessary to specify in the notice of the annual meeting that action would be taken to increase the stock. To this we say that this by-law is in effect the same as the rule, which prevails generally, that of the stated or general meetings of corporations every stockholder is chargeable with notice, and therefore that no notice of the business to be transacted thereat is necessary. Rorer Railroads 189.

"All by-laws must be reasonable, and consistent with the general principles of the laws of the land, which are to be determined by the courts, when a case is properly before them." *Kent* v. *Mining Co.*, 78 N. Y. 159; Mor. Corp., *s.* 496.

Chapter 148, *s.* 5, Gen. Laws, provides that "the amount of capital stock of every such corporation hereafter incorporated or organized shall be fixed and limited by the corporation at its first meeting." In this case the capital was so fixed at $4,800,000. Section 6 of said chapter provides that "the corporation, at any meeting called for the purpose, may increase or reduce its capital stock and the number of shares therein, but the capital stock when so increased shall not exceed the amount authorized by law." These provisions of the statutes contain the policy of this state with reference to the increase of the stock of dividend-paying corporations; and the by-laws referred to, if construed to authorize an increase of stock at any annual meeting without notice, clearly is not "reasonable, and consistent with the general principle of the law of the land." *Kent* v. *Mining Co.*, *supra*.

"It is unnecessary to notify the shareholders of the particular business to be brought before a regular meeting, unless it be of great importance and of an extraordinary character. In the latter

case the object of the meeting must be specified." Mor. Corp., s. 482, citing *Sampson* v. *Company*, 36 Me. 78; *Warner* v. *Mower*, 11 Vt. 385; *People's Ins. Co.* v. *Westcott*, 14 Gray 440; *People* v. *Batchelor*, 22 N. Y. 128; *School Dist.* v. *Blakeslee*, 13 Conn. 227; Green's Brice's *Ultra Vires* (2d ed.) 544; *In re Bridport Old Brewery Co.*, L. R. 2 Ch. 191; *Savings Bank* v. *Davis*, 8 Conn. 192.

The statute provides just two meetings at which capital stock may be increased: The very first meeting of the corporation, and then at any meeting afterwards " called for the purpose." This meeting, not being called for the purpose by a notice setting forth that this business would be transacted at that meeting, there was not a legal and sufficient notice; there was not a legal meeting for that purpose; and, therefore, any action under it against dissenting stockholders is unauthorized and void.

Nor could this requirement of the statute be waived. If it could be, then the statute which provides that "Any such corporation may adopt by-laws not repugnant to the laws of the state " (Gen. Laws, *c.* 147, *s.* 4) would be nullified. A by-law, the substance of which is regulated by statute, clearly stands upon an entirely different footing from one which it is within the power of the corporation to frame and adopt, unrestrained by statute. The former is in effect a part of the corporate charter; the latter, not a contract, but only a rule of action. The former cannot be altered, changed, or modified by any act of the corporation or stockholders; the latter may be. The former has its source in the will of the legislature; the latter, in the will of the stockholders. Cook Stock and Stockh., *s.* 596; *United States* v. *McKelden*, 8 Rep. 778; *In re Long Island Railroad*, 19 Wend. 37; *People* v. *Peck*, 11 Wend. 604; *In re British Sugar Ref. Co.*, 3 K. & J. 408, 413; *Cleve* v. *Corporation*, L. R. 16 Eq. 363; *Brewster* v. *Hyde*, 7 N. H. 206; *Grafton Bank* v. *Kimball*, 20 N. H. 107; *Rollins* v. *Chester*, 46 N. H. 411.

II. While it is undoubtedly true that commonly there is no discrimination in respect to the rights and privileges of stockholders in a corporation, and that they share and share alike in its profits and advantages, this is not always nor invariably true. The charter itself, and the partnership contract entered into by the stockholders, may contain specific provisions which are intended to, and which do, create great inequality in profits, and striking discriminations among the stockholders. The issuing of preferred stock is a common instance of this.

An examination of the act authorizing the Concord Railroad Corporation and the Boston, Concord & Montreal Railroad to unite, and of the agreement to unite executed under it, disclose the fact that distinct, fundamental, and radical discriminations were created among the stockholders, and that their rights were settled upon wholly different bases. Class one of stockholders, representing $800,000 of the capital, or one sixth, is entitled to

receive out of the net income of the road three per cent. semi-annual dividends in preference and priority to all other classes.    Class two, representing $540,400 of its capital, or about one ninth, is to receive no dividends from the earnings of the road, nor from any source whatever, except such as the corporation may be able to pay by the savings made from time to time in fixed charges by refunding the floating debt of the Boston, Concord & Montreal Railroad, and then not more than six per cent. per annum in any event.    Class three of stockholders, representing $459,600 of its capital, or about one tenth, is to receive no dividends from the earnings of the road, or from any source whatever, except such as the corporation may be able to pay out of the savings made in fixed charges by refunding the floating debt after the payment of dividends to class two of stockholders.    If no saving is made in this manner in the fixed charges of the road, then classes two and three of stockholders will receive no dividends, and when the funded indebtedness shall have been finally paid, then it would seem dividends upon classes two and three of stock must cease. Class four of stockholders, representing $3,000,000 of its capital, or five eighths, is entitled to dividends, according to law, but now not exceeding ten per cent. per annum, to be declared out of the balance, if any, of net earnings, after the payment of dividends upon classes one, two, and three of stock.

The act of union recites that $3,000,000 of its capital shall be distributed " to the stockholders of the Concord Railroad Corporation in part compensation for the property, rights, and franchises of that corporation, acquired by its original capital and by the new capital contributed by stockholders from time to time in earnings not heretofore divided; the balance thereof as compensation for the property, rights, and franchises of the Boston, Concord & Montreal Railroad and the interests of the stockholders therein."    This is very significant language, and it shows that an important condition entered into this contract at the time of the union, namely, that whereas the holders of the stock of the Boston, Concord & Montreal Railroad transferred their entire road and all their railroad property " in compensation " for the stock which was issued to them, the stockholders of the Concord Railroad received their three million of stock only in " part compensation " for what they put into the enterprise.    Here is another inequality in their agreement, if it may be called an inequality. It was a difference, at least; it was discrimination.    It was really no inequality, because the Concord stockholders did actually contribute more property than was represented by their capital stock.

It will thus be observed that when the union of these two roads took place, the respective stockholders did not come together upon equal grounds nor upon the same footing; there was not such an amalgamation of the properties of the two corporations nor such

a merger of interests as to work a complete equality of privilege and enjoyment among the stockholders, but, on the contrary, a union of the two corporations, the express covenants and conditions of which created permanent and sharply defined differences among the various classes of stockholders. So, too, by the language of the act, the holders of stock classes one, two, and three took and received the 18,000 shares of stock, which represented all the stock of the Boston, Concord & Montreal Railroad, "as compensation for the property, rights, and franchises" of that road. It was a full, unreserved, and absolute transfer and surrender of all their rights and interests in that road to the new corporation, in exchange for the stock in the new corporation which they received, and which was given the preferences, before referred to, in respect to dividends, among one another, and over class four of stock. On the other hand, the $3,000,000 of stock, or class four, which was disposed of to the stockholders of the Concord Railroad Corporation, was only in "part compensation" for their property. Their contribution to the capital of the partnership was in plain terms admitted to be of greater value than the stock which was to be issued to them. It was received by them only "in part compensation" for their stake in the new enterprise, with a recognized, reserved, valuable, and sole equity in the combined properties not yet represented by stock.

The act permitting the union was supplemented by the contract of union, the provisions of which made more emphatic and pronounced the limitations and restrictions upon the first three classes of stock, and discloses the evident intention of the parties that the holders of classes one, two, and three were to take their stock with their preferences over class four in full discharge and satisfaction of all their claims, rights, properties, interests, and privileges, present or expectant, in and to the new enterprises. That is the only fair construction that can be put upon this contract. Everybody who knows of these roads knows that there was no union of equality. But running all through this contract was a distinct disparity and difference between them, showing that they did not come in upon terms of equality. Their rights were limited and defined, specifically and exactly, by the terms of that contract. This was a kind of union of two corporations in which the Boston, Concord & Montreal stockholders were entirely content with the advantages which came to them in the increased value of their old worthless stock; and the fact that it was to pay dividends hereafter was in discharge and satisfaction of all claims they had to the property of this corporation or in its surplus profits after the union was effected.

It is, then, apparent that the authorities cited by the defendants' counsel regarding the rights of stockholders to the increased capital stock have no bearing or application here, since the rules and principles contained in those decisions are predicated

upon facts which do not exist here, and arise out of conditions which do not obtain here. They are, rather, abstract rules and principles, deduced from the general assumption that no fundamental differences exist among stockholders at the outset, either under the charter of the corporation or the corporate contract. But what are the underlying reasons of the rule, that in the sale or distribution of increased stock all stockholders are entitled to subscribe for such a proportional part of the new issue as their shares bear to the whole stock? They are these, primarily and chiefly: (1) That their right to participate in dividends shall not be impaired without their consent, or unless compensation is made; and (2) because whatever the new shares are worth above par is represented by undivided profits or dividends of which they are part owners. Those are the essential reasons why it is said that in the distribution of stock each stockholder shall have a right to subscribe for it. They are reasons founded on his pecuniary interests. His pecuniary interests are the controlling ones which induce him to enter the corporation. He does not go into the corporation for the purpose of voting, or for the purpose of attending annual meetings, but he goes into it for the purpose of receiving dividends. Therefore, when there is an increase of capital stock, in the absence of limitations as to how that stock shall be distributed, it stands upon the principle that every stockholder shall have a right to subscribe for it in such proportion as his stock bears to the whole, because by so doing he may preserve his dividend rights. If his stock is worth more than par, it is because he is a part owner in the property, which makes it worth more than par, and, therefore, the stock being a representation of this surplus property of the corporation in which he has an interest, when it is transformed into stock, he should be permitted to subscribe for that stock in order to preserve his proportionate share of the surplus profits. Pierce Railroads 123; *Ohio Ins. Co.* v. *Nunnemacher*, 15 Ind. 294; *Curry* v. *Scott*, 54 Pa. St. 270; *Miller* v. *Railroad*, 24 Barb. 312; Rorer Railroads 171, 188.

Applying these principles to this case, it will be seen that, inasmuch as the dividends upon classes one, two, and three are fixed, protected, and secured by the charter and contract of union, and therefore cannot be affected in any way by the new issue, no reason exists why the holders of these classes of stock should have the right to subscribe for the new issue in order to preserve their dividend rights.

In the next place, whatever the new shares are worth above par represents the undivided profits or dividends or assets of the corporation over and above the amount of the original capital. The defendants' counsel say,—" A stock dividend and this new stock, to the extent that the value of the new stock exceeds par, are in principle the same: each is based upon corporate property owned by the stockholders." It follows, then, that if a distribution

of the new stock is made to all classes of stockholders, classes one, two, and three thereby do obtain a dividend out of the undivided profits equal to the premium value of their shares, notwithstanding by the express provisions of the contract class one is to receive semi-annual dividends of three dollars per share " and shall never be entitled to greater dividends," while classes two and three " shall not be entitled to dividends from any source except that resulting from a saving of interest as aforesaid."

It being admitted that one effect of this distribution to all classes of stockholders would be to declare to them a stock dividend to the amount the stock is worth above par, it is in direct violation of the provisions of the contract, which were that they. shall never receive any dividends except six per cent., and that classes two and three shall not receive them from any source except that made from a saving on fixed charges. To-day we will suppose there is no saving. They have no equities in the other profits of the corporation; they have no claim upon its surplus property representing the premium of this increased stock. If you give it to them, are you not giving them something to which they are not entitled, and which by the express terms of the contract it is provided they shall never receive?

In *Leland* v. *Hayden*, 102 Mass. 542, 550, the court say,—" We must regard the principle as settled, that stock dividends are to be regarded as principal, and cash dividends as income." This authority is cited by the defendants' counsel, and undoubtedly states the principle correctly. And yet counsel are here asking that classes one, two, and three of stockholders shall be given a stock dividend in direct violation of the contract, and that after having received full payment for their entire contribution to the principal of the corporation, they may, in violation of the agreement, have and receive something more. Clearly, this is a division of one of two things : it is a division of the capital of the corporation, or of the profits. If it is a division of the capital, you give to the stockholders of classes one, two, and three something more than was represented by the property which they contributed ; if it is a division of the surplus profits, in the nature of a stock dividend, you give them additional dividends to those provided for and fixed by the contract and charter.

Counsel also argued that the act of 1891, *c.* 3, and the attempt to increase the capital, are unconstitutional and void as against dissenting stockholders ; and stockholders having dissented, it cannot be done and the stock cannot be distributed.

*Bingham & Mitchell* and *Frank S. Streeter*, for the defendants.
I.  The plaintiffs' first contention is, that all the new stock should be distributed to the holders of stock taken for the old Concord stock ; and that this right and privilege be denied the holders of stock taken in exchange for that of the Boston, Concord & Mont-

real Railroad. All the stockholders except the plaintiffs, without reference to the character of the stock held by them respectively, voted for or assented to the vote passed at the meeting. They voted that this increased capital stock should be distributed to all stockholders in proportion to the stock held by them in the corporation. The defendants contend that when the capital stock of this or any other corporation is legally increased, and there has been prescribed, in the act authorizing the increase, no restriction or limitation in respect to the sale or disposition of the new stock, the existing stockholders, without reference to dividend discriminations, are entitled to the new stock at par, in such proportion as the number of shares already owned by them respectively bears to the whole number of shares before the increase. This is a property right, vested in the stockholder by virtue of his ownership of the stock; it is a right inherent in the stock from its original issue. The stockholder cannot be deprived of this right by his associates any more than he can be denied any of the other rights or incidents represented by his share of stock. This is a right inherent in his share of stock, like the right to vote, the right to participate in the management of the corporation's affairs, the right to share in its net earnings, and the right to a proportionate part of its assets on its dissolution. These several elements of property are represented by the stockholder's share, unless limited or qualified by the law or contract on which the stock is based; and either one of those rights may be affected or restricted by the law or contract without impairing the integrity of the others, or either of them;—as, for instance, a fixed proportion of the stock may be either a preferred or a deferred class as to dividends,—the division of net earnings,—and yet have equal voting powers, the same right to participate in the general management, and the same right to a proportionate share of the corporation's assets when its affairs are wound up and its property distributed. *Atkins* v. *Albree*, 12 Allen 359, 361; *Gray* v. *Portland Bank*, 3 Mass. 364; *Eidman* v. *Bowman*, 58 Ill. 444; *Cunningham's Appeal*, 108 Pa. St. 546; Cook Stock and Stockh., s. 286; Mor. Corp., s. 455.

The old stockholder is entitled to this right to purchase the new stock at par, even though it is actually worth more, because all of the stock's value, in excess of par, is based upon the existing assets of the corporation, which belong proportionately to the existing stockholders;—as, for illustration, if the new stock of this corporation is worth fifty dollars a share in excess of par, that excess, or fifty dollars, is on account of the value of the corporation's assets above the par value of the capital stock, viz., four million eight hundred thousand dollars; and the property represented by this excess belongs, proportionately, to the stockholders. Therefore, if a stockholder were obliged to pay in excess of par for the new stock, he would be to that extent paying for or compelled to

buy his own property; and, too, if a stranger were permitted to purchase this stock for par when it is worth fifty dollars a share in excess of par, to that extent, that is, the fifty dollars, he would get the property of the old stockholders as a gratuity; and also, for the same reason, if stockholders of one class are given a monopoly of the right to take the new stock at par when it is worth fifty dollars per share in excess of par, and this excess of value is based upon the property of the corporation, in which all classes of stockholders share equally or proportionately, then there would be given as a gratuity to one class of stockholders property, rights, and interests which belong to other classes. So in this case, if the new stock, the twelve thousand shares, should all be apportioned to that class of stockholders to which the plaintiffs belong, while the other classes, those of the Boston, Concord & Montreal Railroad, are excluded, then the stockholders of the "fourth class" would be given two hundred and twenty-five thousand dollars worth of corporate property which belongs to the Boston, Concord & Montreal stockholders. This is the sum which three eighths of the twelve thousand shares of new stock, the Boston, Concord & Montreal stockholders' proportionate part, aggregates at fifty dollars a share.

The logic of the plaintiffs' contention is, that to them and their class should be given, gratuitously, the property of the Boston, Concord & Montreal stockholders. Their contention cannot be sustained without leading to this result. If a stranger purchased the stock, he would have to pay its value, and so the fifty dollars per share in excess of par would be paid for, go into the treasury, and in that way each stockholder would get his proportionate share of this property represented by the excess; but the plaintiffs want this property represented by the excess above par, and do not want to pay for it. To yield to their desire would be to take, illegally and inequitably, the property of other stockholders and transfer it to them without compensation or right.

A share of stock is defined to be "a right which its owner has in the management, profits, and ultimate assets of the corporation." Cook Stock and Stockh., *s.* 5. "They entitle the holder to participate, in a certain proportion, in the management and to share in the net profits of the corporation, and, upon its dissolution, in the surplus of its capital remaining after the payment of its debts." Pierce Railroads 110. The stock of a corporation, if the law allows it, may be of different classes with respect to the division of the net earnings; that is, it may be either preferred, deferred, or common stock. Cook Stock and Stockh., *s.* 9; Green's Brice's *Ultra Vires* 172; *St. John* v. *Railway*, 22 Wall. 136.

"Upon the dissolution of a corporation, and the distribution of its assets among the shareholders after the payment of the corporate indebtedness, it is the settled rule of law that, in the

absence of any statutory provision, preferred shareholders have no priority over common stockholders. Their stock was preferred in respect to dividends, and not in reference to the capital stock. The assets of the corporation are to be distributed as though no preferred shares had been issued. The preferred shareholder, in the distribution, becomes a common shareholder." Cook Stock and Stockh., *s.* 278.

It will thus be seen that, under the law, aside from the discrimination with respect to dividends from the net earnings, all the stock of this corporation stands alike,—the same with reference to management and interest in the capital.

If the corporation declared what is called a stock dividend,—a dividend to cover property accumulated in excess of sufficient to represent the capital stock at par,—the preferred and common stockholders would share proportionately in such a distribution. *Gordon* v. *Railroad*, 78 Va. 501; *Phillips* v. *Railroad*, 138 Mass. 122; *Minot* v. *Paine*, 99 Mass. 101; *Daland* v. *Williams*, 101 Mass. 571; *Rand* v. *Hubbell*, 115 Mass. 461; *Gifford* v. *Thompson*, 115 Mass. 478; *Moss's Appeal*, 83 Pa. St. 264; *Leland* v. *Hayden*, 102 Mass. 542, 550; Pierce Railroads 123.

To yield to the unreasonable, inequitable, and illegal demand of the plaintiffs would not only be transferring to them, without compensation, the property of other stockholders, but it would be arbitrarily diminishing their voting power, and correspondingly increasing that of the plaintiffs and those of their class. The stockholders, whom the plaintiffs thus attempt to wrong, now have three eighths of the voting power; but should the right to increase the capital the full three million dollars be exercised, and the whole increase went to this "fourth class," then the voting power of this class would be doubled, and the stockholders who now have three eighths would then have but three thirteenths of the voting power. The voting or managing power of a corporation is a most valuable right or franchise; it is the right, oftentimes, on which the value, or worthlessness, of the stock depends; it is the exercise or improper use of this right that has wrecked and ruined many corporations, and rendered their stock entirely valueless; and in this instance, on the preservation or loss of this important right might depend the value of a part, if not the whole, of the stock of this corporation; and no stockholder should, without compensation and against his consent, be deprived of this right that is so essential to the protection and preservation of all his other rights.

II. The stockholders, at the meeting in which this vote was passed, had the right to adopt it. The negative of this proposition constitutes the plaintiffs' second ground for enjoining the issue of the increased capital stock, and thus obstructing and preventing the increased railroad facilities contemplated by the legislature and demanded by the public.

This legislative authority to increase the capital stock,—this amendment to the charter,—could be accepted only by the stockholders.

"An increase or reduction of the capital stock of a corporation is such a fundamental change in its affairs, that, although it has been duly authorized by act of the legislature, or by the charter of incorporation, it cannot lawfully be effected merely by the act or assent of the board of directors, but must be authorized by the shareholders at a corporate meeting." Cook Stock and Stockh., *s.* 285; Mor. Corp., *s.* 512. The meeting of October 13, 1891, was an annual meeting; and at that meeting, without special notice of the subject, the stockholders could do any business within the corporation's power. But, although unnecessary, there was special notice of this particular subject. The first subject mentioned in the call, and the one on which the stockholders were notified that they would be called upon first to act, was "the report of the board of directors;" and in that *report*, which had been generally *distributed among the stockholders several days before the meeting*, was contained a recommendation of the exact increase voted, with the reasons therefor fully stated.

The stockholders had the right to determine when the interests of the corporation and those of the public require an acceptance of the legislative authority to increase its capital, and also when the contemplated improvements should be made.

Doe, C. J. I. Under Laws of 1889, *c.* 5, the Concord Railroad and the Montreal Railroad have united and formed a new corporation, called the Concord & Montreal Railroad, on terms agreed to by a two-thirds vote of each party. Chapter 46 relates merely to the corporate name. The stockholders of the uniting corporations being members of the new corporation, their rights as members of it are equal except in those respects in which inequality is established by *c.* 5, the contract of union which that chapter authorized, and the number of their shares. With no agreement to the contrary, a share of Concord & Montreal stock would be a proportional share of the equitable title of the corporate property, and among the components or incidents of the title would be proportional shares of the right to receive dividends and to control the management of the property by the voting power. The rights comprised in each share are the same as those comprised in every other share, with such differences as were introduced by the contract of union, which includes the laws under which it was made. If these differences were not satisfactory to any member of either of the uniting corporations, he was not required to submit to them. He could not be forced into the new company. *Clearwater* v. *Meredith*, 1 Wall. 25, 41; *Lauman* v. *Railroad*, 30 Pa. St. 42, 46; *Mowrey* v. *Railroad*, 4 Biss. 78, 85; *Black* v. *Canal Co.*, 24 N. J. Eq. 455; Mor. Corp., *s.* 646. By dissenting, he could

compel that company to buy his stock at its value, ascertainable under *s.* 1.     Before the union, the Concord and the Montreal, being business corporations, were partnerships, with common-law partnership rights and liabilities, modified in some respects by statute.     By becoming members of those companies, the stockholders had accepted the charters and other corporation laws as their partnership contracts.     By becoming members of the Concord & Montreal, they assumed the relation of partners whose contract is in the act of 1889 (which contains the new charter); in the old charters, materially amended by the new; in other laws; and in the agreement of union which formed the new corporation.     Their rights, so far as they are involved in this case, are contractual; and their intention, proved as a fact by competent evidence, is their contract.

The provision of *s.* 3 of the act of 1889, that "the stockholders in the uniting corporations who have assented" to the union (exchanging their certificates of stock being a manifestation of assent) "shall be members of the new corporation," seems to have no peculiar significance, and to be of no importance.     The union of the old companies would import membership in the new company, and equality in the shares of that company, unless a different purpose were shown by the true construction of the "agreement for union."     Such an agreement, made in general terms, without a specific provision for membership, would naturally mean a formation of one company out of the members of several companies, on a footing of equal rights in the property of the new company in proportion to the number of their shares, except so far as an intention to create or continue inequality were proved by competent evidence found in some part of the contract. In this case, the provision that the assenting members of the old companies shall be members of the new one is nothing more than would be implied from a general agreement to unite the old companies.     The Concord stockholders were the Concord company.     The Montreal stockholders were the Montreal company. The union of the companies was a union of the stockholders. The property of each of the uniting companies belonged to its members.     The property of the Concord & Montreal belongs to its members.     The circumstance that they are an incorporated trustee, holding the legal title, is immaterial.     One material fact is that they are beneficiaries, holding the equitable title, and that the rights involved in this case are not affected by the mere division of their title into legal and equitable parts, but are what they would be if the owners were an unincorporated body, holding their property as tenants in common and partners without a trust, and with the power of increasing their capital that was accepted by their partnership contract.

Section 10 of the new charter authorizes the new company to buy twelve other roads,—the Mt. Washington, the Whitefield &

Jefferson, the New Zealand Valley, the Profile & Franconia Notch, the Pemigewasset Valley, the Lake Shore, the Tilton & Belmont, the Suncook Valley, the Suncook Valley Extension, the Manchester & North Weare, the Concord & Portsmouth, and the Nashua, Acton & Boston. "For the purpose of facilitating said purchases, and to carry into effect the agreement or agreements made as hereinbefore authorized," the Concord & Montreal may "increase its capital stock to such amount as may be requisite," with a proviso limiting the amount of capital on which dividends can be paid, and a stipulation that after a purchase of either of the twelve roads, the Concord & Montreal shall "have and enjoy all the rights, privileges, and franchises theretofore had and enjoyed by the selling" corporation. This provision in relation to an increase of capital is one of the articles of the partnership contract. In none of those articles is there an express stipulation as to the distribution of the right to subscribe for the increase of capital authorized by *s.* 10. It was one of the subjects that could have been expressly regulated by the contract, by which the stockholders of the uniting companies were empowered to determine, and did determine, the terms of their union. But it was one of the subjects on which they left their contract to be inferred from the stipulation of *s.* 3, that all the stockholders of the old companies who assented to the "agreement for union" should "be members of the new corporation," and from any other clauses of their compact containing evidence of their intention.

Another of their partnership articles is *s.* 6, *c.* 148, Gen. Laws. The first section of this chapter provides that "The rights, powers, and duties set forth in this chapter shall be incident to all corporations having for their object a dividend of profits, hereafter incorporated." For the purpose of the present inquiry, the Concord & Montreal was incorporated after the enactment of *c.* 148. *St. Louis, etc., Railway* v. *Berry*, 113 U. S. 465, 474, 475. Section 6 of that chapter is,—"The corporation, at any meeting called for the purpose, may increase or reduce its capital stock, and the number of shares therein, but the capital stock when so increased shall not exceed the amount authorized by law." The distribution of new capital under this clause, like the distribution under *s.* 10 of the act of 1889, was not expressly stipulated, but was left to be implied from all competent evidence furnished by the partnership contract.

If all the shares of the old companies had been of equal value, and it had been agreed merely that the holder of each of those shares should have a share of the new company, the equality of the former shares would have been maintained. The contract of union shows there were four classes of former shares, of unequal values,—three of Montreal and one of Concord,—and that their inequality was adjusted in the new company by dividing its shares into four classes with unequal rights to dividends. The

contracting parties could also have agreed that these classes should be unequal in the ownership of the road and in the right to vote. But on neither of these points is there any express provision against equality.

Chapter 1177, Laws of 1851, authorized the issue of preferred Montreal stock to complete the road to Wells River. This stock was to be "entitled to a preference or priority in dividends, so that said stock shall first receive, from the net income of the road, dividends to the amount of six per cent. per annum." If there was no other stipulation on the subject, a share of preferred and a share of common stock were equal in ownership of capital, and equal in the right to vote. Except in dividends, the rights comprised in a common share were no more affected by the issue of 100 preferred shares under the act of 1851 than they would have been by an authorized issue of 100 common shares. The issue of preferred shares was not a conveyance of the whole road to the preferred stockholders, or of so much of it as would make a holder of a preferred share a larger owner of the capital than a holder of a common share. With the consent of the stockholders and the legislature the road could have been sold. By due process of law it could have been sold on execution, or foreclosure, or under an exercise of eminent domain, notwithstanding the unanimous objection of the preferred stockholders. If it had been sold, the proceeds left after payment of debts would have been legally divisible among the owners of the road in proportion to the number of their shares. A holder of a common share being the equal of a holder of a preferred share in ownership of the property sold, would receive an equal share of the proceeds, unless he consented, before or after the sale, to take less. The contract which united the Montreal and the Concord companies tends to show that between the preferred stock and the old stock of the Montreal company, considered solely as dividend-paying investments, there was a difference of value, and so great a difference that an equal division of the dividend-earning capital (the proceeds of a sale of the road) among the stockholders, without distinction of classes, would have been grossly inequitable. And it does not appear that the original partnership articles of the Montreal company, or the supplementary article for the issue of preferred stock under the act of 1851, contained any stipulation against such a division.

The reason of the omission of an explicit agreement on a subject that might become so important is not stated. A conveyance of half of a farm, in common and undivided, to A, with a preferred right to ten per cent. on his investment, to be paid him annually out of the income of the farm, would inform him what share of the common capital would be his on partition by sale or otherwise. Having acquired but half of the title, and made no contract, either against a partition or for a partition, that would

give him more than the share he bought, his rights would not be infringed by an equal partition that would materially damage him and materially benefit his co-tenant by terminating the preferred right to income. Parol evidence that the possibility and probability of a partition were overlooked when he took his conveyance, would be inadmissible. The written contract could not be altered without the consent of both parties. To obtain a reformation of his deed, it would not be enough for him to show that partition was not thought of. The contract was, not something that did not occur to the parties, but their intention and understanding expressed in writing. They intended that A should have half of the land title; and the law could not violate their contract by giving him more. It is not an unusual occurrence that a bargain turns out better for one party than for the other, by reason of something not expected by either.

It does not appear that any information on the subject of a total or partial division of capital was expressly given by the certificates of preferred Montreal stock; that attention was called to it by what was written, said, and done; or that it was in the mind of any of the persons concerned in the issue of that stock. The shares of stock, old and preferred, were personal property. A large part of the corporate property was real estate. It may be unsafe to assume that any Montreal stockholder, common or preferred, regarded his certificate as evidence of his being, in any legal sense, a land-owner. The rights of each stockholder of each class, as an owner of a part of every piece of the corporate property, was a subject on which there may have been little if any discussion or discourse, and on which the prevailing ideas were probably limited and indistinct.

It is probable that a difference in the value of the different classes of Montreal stock was anticipated when the preferred stock was issued. It may have been supposed that the preferred would be at par, and that the old would be worthless. The future value of the old stock may have been a question on which no trustworthy opinion could be formed. On the face of the transaction, with no other information of it than the case gives, it seems improbable that it was understood and intended that the old and the preferred shares could be made of equal value by a sale of the road. But strong as the presumption appears against the existence of such an understanding, the point is one on which there may have been no actual understanding. The preferred stockholders being part owners of the road, it could be sold only by their consent, or by due process of law. They could withhold their consent; they could sell their shares without a sale of the road; they may not have heard of a railroad's being sold without the owner's consent; and the possibility of such a sale of the Montreal may not have occurred to them. Even if a sale was thought of, their foresight may not have gone beyond to a divi-

sion of the proceeds, operating as a partition of the property, and an unjust equalization of the positions of classes of owners. If this contingency was not foreseen, it did not become an element of the market price of either class of stock. Had a partition by sale been anticipated as an event likely to happen immediately, the preferred stock might not have been taken without a contract against such a partition as would be a great gain for one class and a great loss for another class. Numerous reported cases illustrate the limited knowledge of the future on which railroad and other business investments and enterprises are made and undertaken. In many corporations there have been and are different classes of stockholders, and in the omission of a provision against a division of capital (in cash, or in new stock) on the basis of the numerical proportion of shares, the Montreal seems not to have been an exceptional case. It is understood that such a provision is generally omitted.

It is said, that upon the dissolution of a corporation and the distribution of its assets, preferred stockholders have no priority over common stockholders, because the preference given and acquired relates to dividends and not to the capital stock; but that where a preference as to capital is contracted for (which is not generally the case), the rule is, of course, otherwise. Cook Stock and Stockh., s. 278. The result is controlled by the contract of the parties. Subject to the payment of debts, the proceeds of a sale of the Montreal road would have belonged to the stockholders, because the road was theirs. When A paid the company $100 and received a certificate of a share of preferred stock, the money became the property of all the stockholders, and he became one of the owners of all the corporate property, under a special contract concerning a preference in dividends, but with no contract qualifying the evidence (furnished by their certificates) that their ownership of the capital stock was in proportion to the number of their shares; and a total or partial division of the capital among them would have followed that proportion, not by reason of a peculiar rule of corporation law, but because, by contract, they had determined the shares in which they owned the road, and no law could authorize a partition of it according to any other title than that by which they held it. Stock dividends and issues of preferred stock stand on the same ground as a partition of the whole road. The issue of a certificate to a new stockholder, making him one of the owners of the road, would be a conveyance of title which can be made only with the owner's consent, or by legal process. When a stock dividend is made, or new stock (preferred, common, or deferred) is issued, each stockholder is entitled to a portion of it, not merely because the issue may affect his right to dividends, but also because the new stock includes an undivided part of the road, of every part of which he is an owner, and because every shred of his title is as indefeasible

and inviolable as the whole of it would be if he were the sole unincorporated owner of the road.

When the members of the old companies formed themselves into the Concord & Montreal and united the two roads, a holder of a preferred Montreal share put into the capital of the new company no more of the Montreal road and rolling-stock than was contributed by an owner of a Montreal common share. And as the Montreal preferred and common shareholders had been equal, except in the particular in which they had established an inequality by their partnership contract, so in the new company equality and inequality are determined by the "agreement for union" by which the company was created and the rights of its members were fixed. In that agreement, the unequal value of the four existing classes of stock was not overlooked. Their inequality was adjusted in a manner that shows that the extent of the disparity in market price was well known; and it may properly be inferred that every important stipulation was inserted in the contract that the circumstances of the case were supposed to require. If the possibility of a sale of the road or an increase of capital had not been seen, the omission of a specific agreement for distribution among the owners of the road would have been accounted for. But the clause expressly stipulating that the capital might be increased to an amount requisite for buying the twelve roads and carrying into effect the agreements authorized by the act of 1889, shows that such an increase was thought of, and that either the mode of distributing the new stock was overlooked, or the classes of shareholders could not agree on any other measure of distribution than the numerical proportion of their shares, or that for some reason it was not considered necessary or expedient to make distribution the subject of an express and plain agreement.

The apparent difference in value (for a dividend purpose) of such classes of stock as the Montreal preferred and the Concord on the one hand, and the other two classes on the other, and the importance of the question whether distribution should be according to the number or according to the value of the shares, or whether it should be limited to one or two classes, are cogent proofs of the intention of the contracting parties. The stock of the new company was divided into four classes, because the Concord & Montreal road was to be owned by four classes of shareholders,—three Montreal classes and one Concord class. It must be inferred that such equalities and such inequalities were introduced as were supposed to correspond, in some just degree, to the existing state of things, which included the market values of the three classes of Montreal stock and the single class of Concord. Had it been understood that if the whole capital were distributed in cash on a sale of the road, or a part of it were distributed in certificates by a stock dividend or by an increase of capital, the distribution should be made on some other basis than the owner-

ship of the capital, for what reason could that understanding have been left to be inferred from the terms of a written contract containing no express allusion to the subject? If they had intended that on a division of the property the owner of one share should have more and another less than his fraction, how could they have failed to say how much more should go to one and how much less to the other? Probable as it is that the parties did not understand distribution would be equal (that is, in proportion to the number of shares held by each owner of the road), it seems equally probable that if any other rule or measure of distribution had been intended than the shares of the title by which the stockholders held the road, it would have been fully set forth, or at least distinctly and specifically mentioned, in the contract.

The third article of the contract is very explicit. " The capital stock of said new corporation shall be $4,800,000, divided into shares of the par value of $100 each, and into classes of the kinds and amounts following, . . . Class 1, to be known as ' . . . Montreal preferred stock,' shall consist of 8,000 shares, and shall be entitled to [specified dividends]. Class 2, to be known as ' . . . Montreal new stock,' shall consist of 5,404 shares, and shall be entitled to such dividends . . . Class 3, to be known as ' . . . Montreal old stock,' shall consist of 4,596 shares, and shall be entitled to such dividends . . . Class 4, to be known as ' Concord stock,' shall consist of 30,000 shares, and shall be entitled to such dividends . . ." The fourth article is equally clear. " Said capital stock shall be apportioned among the stockholders of the parties hereto, as follows: 1. To holders of preferred stock of the . . . Montreal Railroad, one share of the stock of Class 1 for every share of said preferred stock held by them." By similar clauses, the other classes of stock are assigned to the proper classes of persons.

The classification is of the right to dividends, and there is nothing in its terms indicating that it is of anything else. Each owner of a share of the uniting companies is entitled to a share in the new company. A share of what? " The capital stock of said new corporation shall be $4,800,000, divided into shares of the par value of $100 each." There are 48,000 shares; each share is $\frac{1}{48000}$ of the capital stock of the new firm; and the capital stock is all the partnership property, real and personal. Every shareholder of every class is an owner of the Concord & Montreal road, not in proportion to the value of his former or his present shares, or his right to dividends (which materially affects the value of his share of the road), but in proportion to the number of his forty-eight thousandths of the capital stock. Of his title as a proportional owner (aside from the right to dividends), and his incidental, proportional power of controlling the management of the common property by his vote, there is no express or implied limitation.

His unqualified right to vote is expressly recognized in *s.* 5 of the act of 1889. As a division of the whole capital, on a sale of the road, would be a division of property, a part of which is his, so an issue of new shares on an increase of the capital is a division of a part of his estate, no part of which can be taken from him without his consent or legal process. His right to his own property,. on a distribution caused by a sale of the road or by an issue of new shares, is as free from express qualification as his title to the realty and rolling-stock, and his right to vote. The fact that the contract which fixes with exactness his proportional ownership of the capital, so long as it remains undivided, does not expressly provide for a transfer of any part of his share to his partners on a total or partial division of capital, is conclusive evidence that no such transfer was intended.

There is, moreover, an insuperable difficulty in the question,. What part of his share is to be transferred to others ? On this point the contract is silent; and it certainly was not understood that on a sale of the road all the proceeds would be paid to stockholders of Class 4, and that the entire property of Class 1 (entitled to 6 per cent. dividends before any are paid to Class 4) would be extinguished. A contract by which the former owners of the Montreal would lose its whole value by the union with the Concord, followed by a sale of the Concord & Montreal (under eminent domain or other legal compulsion), cannot be implied. Nor is there any ground for implying such a distinction between a total and a partial division of the capital, that on a division of the whole capital Class 4 of the stockholders would take the whole, but on a partial division, by an issue of new shares, they would take less than the whole amount distributed. On a total or partial division of capital they must be entitled either to the whole amount divided, or to only their forty-eight thousandths of it. The contract does not allude to any other proportion or fraction as a measure by which a division of capital can be made. Inequitable as it seems, that on a division of the whole capital a holder of a share of Class 3 should receive as much as a holder of a share of Class 1 or Class 4, the payment of the whole capital to Class 4 would be open to equal objection on the score of justice. Between these inequitable results the contract makes no compromise. As to the intention of the parties, equity furnishes no argument in favor of the right of Class 4 to the whole capital, divisible on a sale of the road, or to all that part of it divided by an issue of new stock. In the absence of an agreement for a different partition, there is nothing to prevent the proportional division that is one of the rights comprised in the proportional ownership of the property.

The fourth article of the contract provides that "The stock of the new corporation shall be full payment for the stock of the old corporation for which it is to be exchanged as aforesaid." This

clause leaves no ground for a claim of any class that their forty-eight thousandths of the Concord & Montreal road were not received in full payment for their surrendered shares. The clause would apparently have been superfluous but for the provision of *s.* 7 of the act of 1889, that $3,000,000 of the capital stock of the new company should be issued to the stockholders of the Concord in part compensation for their contribution to the capital of the new company, and that the balance of the $4,800,000 should be issued as compensation for the Montreal contribution. If that distinction between compensation and part compensation had not been annulled, it would have been necessary to look not only for competent evidence of a contract that further payment was to be made, but also for evidence of an agreed mode and amount, and to inquire whether an agreement was proved that payment was to be completed by giving Class 4 all the shares of the other classes, or some ascertainable part of them, on a total or partial division of the Concord & Montreal capital. But this subject is disposed of by the performance of the subsequent agreement that the stock of the new corporation should be received in full payment. If the expression " part compensation " in the new charter recognized the right of the Concord stockholders to insist upon further payment, it was, at most, a provision for their benefit, which they could waive in forming the new company " on such terms and conditions as " should be agreed to by themselves and the Montreal, and which they did waive by accepting $\frac{39}{48}$ of the new company's stock in full payment as one of the " terms and conditions " of union.

The agreement that Class 1 shall be entitled to six per cent. " dividends from net earnings, . . . and shall never be entitled to greater dividends," and that " Classes 2 and 3 shall not be entitled to dividends from any source except that resulting from a saving of interest," is a restriction of the right to dividends of the described earnings and savings, and not of the right to dividends of capital. The word " dividends " is here used in its ordinary sense as a description of divided profits and gains arising from the use and management of the capital. " Dividends are of the earnings or product of the road, and not of, nor can be of, the corporate capital." Rorer Railroads 188. On a proper occasion there may be a dividend of capital, but in this contract there is no agreement that, on partition, the whole capital, or the whole of it that is divided, shall go to one class of its owners. It is incredible that the parties intended, if the state should take the consolidated road as soon as the union was completed, that the union should be nothing but a gift of the Montreal to the owners of the Concord. And if it is also incredible that the parties had a positive and distinct intention that no discrimination should be made between the classes on a total or partial division of capital, these negations do not entitle one class to all the new stock issued on

an increase of capital. In the absence of competent evidence proving an actual intention at variance with that shown by ownership in common, no class of the common owners can be deprived of their property by partition.

II. By the notice of the annual meeting, held October 13, 1891, at which the company voted to increase the capital, the meeting was not called for the purpose of increasing the capital, within the meaning of *s.* 6, *c.* 148, Gen. Laws, which permits an increase of capital "at any meeting called for the purpose." The notice was, that the annual meeting would be held at a specified place and time "to act on the report of the board of directors, to choose a board of directors for the ensuing year, and to transact any other business that may be brought before the meeting." In their report, the directors recommended the increase of $1,200,000 that was voted at the meeting; and it is averred in the answer that this report "had been distributed generally among the stockholders several days before the meeting." The notice does not refer to the report as an annexed or as an accompanying document, nor in any way make it a part of the notice. The notice does not state that an increase of capital was one of the purposes for which the meeting was called, nor inform the stockholders that a question of increase would be submitted to them, or that there was or would be anything in the directors' report relating to that subject.

The company's first by-law contains this clause: "Any business within the power of the corporation may be transacted at annual meetings, although the subject-matter thereof is not specified in the notice." There was a similar by-law in *Richardson* v. *Railroad*, 44 Vt. 613, 619, and it may be a common regulation. It is evidently based on reasons on which the authorities have established a difference in the notices required for regular, and those required for special, meetings. Mor. Corp., *ss.* 479, 481, 482; Cook Stock and Stockh., *ss.* 594, 595, 598; Dill. Mun. Corp., *ss.* 262, 264; Mechem Public Officers, *ss.* 172–176; Paine Elections, *ss.* 384–387; Cool. Const. Lim. 759. In a Vermont case, the notice was that the annual meeting of the stockholders would be held at a specified place and time. The court said,—"A manifest distinction obtains between general stated meetings of a corporation and special meetings. . . . Stated meetings of a corporation are usually general, *i. e.*, for the transaction of all business within the corporate powers. . . . Where the meeting is stated and general, no notice is required either of the time or place of holding the meeting, or of the business to be transacted. Angel & Ames Corp. 275. Such is the general law of private corporations . . . The annual meeting, of all others, is the one when, not only usually, but always, all business is expected to be transacted. And the common custom of a country is of great force in the construction of statutes as well as contracts. . . .

The clerk here served a notice . . . stating the time and place of the meeting, and that it was the annual meeting of the company. This was certainly all the notice which could be given of the annual meeting. As each corporator knew that it was competent at this meeting to transact all business pertaining to the corporate interests, the very term, annual meeting, was, *ex vi termini*, notice to that effect; and it could have answered no good purpose to repeat this in the notice." *Warner* v. *Mower*, 11 Vt. 385, 387, 391, 392, 394. "As a general rule, it may be safely affirmed, perhaps, that in regard to general meetings of the company, which are for the transaction of all business, no notice of the particular business to be done is necessary." Redfield Railways, s. 21. In other authorities the rule is stated with material qualifications. In this case, the notice contained information which the by-law did not require it to give. The by-law would have been complied with by a notice of the time and place of the annual meeting.

The statutory provision that the capital can be increased at a meeting called for the purpose, is a part of the partnership contract, but being also a law of the state it cannot be suspended or repealed by any other power than that of making law. The by-law is to be construed as if it contained a proviso excepting from its regulation of notices of annual meetings the business which cannot be legally done at those meetings without specific notice. If it were construed to allow an increase of capital at a meeting not called for the purpose by the notice, it would be inoperative in this case, because not authorized by *s.* 4, *c.* 147, Gen. Laws, which affirms the general rule of the common law that corporations may "adopt by-laws not repugnant to the laws of this state." The legislative power of altering the law of the land cannot be delegated to the defendants. The grant of power to increase capital "at any meeting called for the purpose," is a grant limited in an important particular. The limitation is a general law, applicable to an increase of capital under *s.* 10 of the act of 1889, and *c.* 3 of the act of 1891. *DeLancey* v. *Insurance Co.*, 52 N. H. 581. If there is a lack of corporate capacity to increase capital at a meeting not called for the purpose, the want cannot be supplied by a by-law. The clause "at any meeting called for the purpose" is to be so construed as to accomplish the legislative design. Its operation can be neither more nor less extensive than the end it was meant to be a means of attaining. If it was intended to be, not an absolute withholding of the power of increasing the capital at a meeting not called for the purpose, but a protection of stockholders against a special danger arising from their not having adequate information of a proposed increase, the question is whether the stockholders have had the intended protection.

In *Rex* v. *Langhorn*, 4 A. & E. 538, on *quo warranto*, the ques-

tion was whether a meeting of the burgesses of Berwick-upon-Tweed, at which the defendant was elected mayor of the borough, was duly assembled. The custom was for all resident burgesses to receive a personal summons. One of them, Robertson, a fisherman, was not summoned, for the reason, as the notifying officer testified, that Robertson had several times told him not to summon him, as he was frequently out at sea. It was held that attendance was a public duty on the part of each burgess ; that notice was required, not for his personal benefit, but as an admonition to perform his public duty ; that the public had a right to the security afforded by the service of notice on each member of the corporation, and that he could not waive the public right. The reason of that decision is not applicable to the present case. The requirement of a notice of a proposed increase of capital in the call for a railroad meeting is not a security for the performance of a public duty, but a protection of the private rights of each stockholder against the harm that might result from an increase of capital voted at a meeting not called for the purpose. The general rule is, that any one can waive a proceeding required for his exclusive benefit. When the object of a statute is completely accomplished, the law is often satisfied although some of its prescribed methods have not been followed. If, on a point affecting an individual's private rights, he has all the information he is entitled to, telling him what he knows is not always an essential ceremony. If every Concord & Montreal stockholder had attended the annual meeting in October with full knowledge of the proposed increase of capital, and had enjoyed all desired opportunity to oppose it and to prepare for opposition, there would be strong ground to argue that the vote was not void for want of words in the notice that would have been as useless, for the practical purposes of the stockholders, as the most unmeaning procedure that could be devised.

"It is objected that notice of the meeting for the election of directors was not proved ; but the objection is, in this case, unimportant, as from the evidence it appears that the subscribers here sued were present by proxy, and voted." *Jones* v. *Turnpike,* 7 Ind. 547. "We are inclined to the opinion that all the stockholders being notified and present at the meeting, and no objection having been then made to the regularity of the notification, all objections on that ground have been conclusively waived." *Stebbins* v. *Merritt,* 10 Cush. 27, 34. "The court rejected the offer of the defendant to prove that no notice had been given of the first election of directors. I think this was properly rejected, on the ground that the defendant could not avail himself of a neglect to give notice to any other stockholder. The defendant himself was present at that meeting, and voted, and was elected a director. He has not suffered by an omission to serve notice, and he is not in a situation to object as to others." *Schenectady,*

*etc., Plank Road Co.* v. *Thatcher*, 11 N. Y. 102, 108, 113.   There are other authorities on this point.   Cook Stock and Stockh., *s.* 599; Dill. Mun. Corp., *ss.* 263, 264, 266; 18 Am. Dec. 103.

*Sherwin* v. *Bugbee*, 17 Vt. 337, was trespass against a tax collector of a school-district for taking the plaintiff's oxen in the collection of a tax voted at a meeting of the district.   It did not appear from the record of the warning that the hour of the day at which the meeting was to be held was specified in the warning.   The defendant offered parol evidence to prove that in the original warning for the meeting, which was posted up in the district, the hour of meeting was set at six o'clock in the afternoon.   This evidence was excluded.   The defendant offered to prove by parol evidence that all the legal voters were present and voted at the meeting, and that they all met at about six p. m.   This evidence was excluded.   The defendant then moved that the case be continued, and that the clerk of the district be permitted to amend his records so as to conform to the fact as to the warning.   The motion was denied, and the plaintiff had judgment in the county court in apparent pursuance of an exceptionally harsh practice in tax cases that is obsolete in this state.   The supreme court held that the defendant's parol evidence concerning the original warning, and the attendance of all the voters at the meeting, was rightly rejected.   " The subject of imposing taxes," say the court, " has always been scrutinized and narrowly watched; and a strict and rigid compliance with the law has been required to make the taxes legal.   The case of an election has usually been construed more liberally."   Decisions of other jurisdictions are necessarily considered here in view of the fact that an equal division of our public expenses is not now obstructed by strained and quibbling interpretation, a strict observance of frivolous formality, and a disregard of substance and principle.   On *quo warranto* to determine title to office, such evidence as the defendant offered in *Sherwin* v. *Bugbee* is ordinarily received.   Its competency in a tax or railroad case need not now be examined.

In *Commonwealth* v. *Smith*, 132 Mass. 289, on *quo warranto* to determine the defendant's title to the office of county commissioner, the question was upon the validity of the notice of the annual meeting in the town of Gay Head.   The statute required " a warrant under the hands of the selectmen, directed to the constables or some other persons appointed by the selectmen for that purpose, who shall forthwith notify such meeting."   The chairman of the selectmen posted on the door of the meeting-house a notice, not directed to constables or other persons appointed by the selectmen.   Eight registered voters were absent from the meeting.   Of those present, all voted for county commissioner but one.   Of the eight who were not present, five had actual notice of the time and place of the meeting and that a county commissioner was to be voted for, and did not remain away from the meeting on account

of any want of notice; and of the other three, two were at sea, and one was confined to his bed by sickness. "If these facts are competent," say the court, "it becomes apparent that the defects in the notice or warrant and in the mode of serving it worked no injury, and that the election was as fully attended as if all the provisions of the law in calling the meeting had been strictly followed. These facts are competent, unless the provisions of the statute which have been disregarded are strictly mandatory, and we are of opinion that they are not . . . The main purpose of a warrant for meetings for such elections is to remind legal voters of their right and duty to vote, and of the officers to be elected. . . . If this election at Gay Head be declared void, there can be no new election for county commissioner at Gay Head, and the voters there will have been deprived of their votes without fault on their part, in consequence of the negligence of the selectmen." It was held that the election at Gay Head was not void.

Whatever may be the rule as to the admission of evidence to show that no actual injury resulted from a defective notice of a corporate meeting, it is necessary to consider the nature and extent of the protection intended to be given to stockholders by the requirement of a meeting called for the purpose of increasing the capital. The law applicable to this branch of the case was enacted not merely for the benefit of the owners of the Concord & Montreal road in its present situation, but for the security derivable, by this and many other companies in various conditions, from a specific call to all members to exercise their judgment, with opportunity for inquiry and consultation, and to vote for or against an expenditure and expansion that might be judicious, and might be disastrous. If the plaintiffs could complain of their own want of information only, and not of an omission to give notice to other stockholders, the question might arise whether their objection, made ·at the meeting, to the sufficiency of the notice, would avail, or whether that objection would be obviated by their attending the meeting with all the information a sufficient notice would have given them. But there seems to be no good reason for a construction of the statute that would limit the plaintiff's right of objection to the sufficiency of the notice as a means of giving themselves information. If a written notice had been given to each of them, stating .that the meeting was called for the purpose of increasing the capital from $4,800,000 to $6,000,000, it might be claimed that they had all the information on the subject of increase that the legislature intended they should have. But if the same information were withheld from other stockholders, the plaintiffs might be damaged by a vote to increase the capital, which could not have been passed on due notice of a meeting specifically called for the purpose. Each stockholder was entitled to the protection that would be furnished

by such an assemby.  This is the natural meaning of the statute, and the legislative purpose is proved by competent evidence. Each stockholder was entitled to the protection that would be furnished by such a notice as would inform those who read it of a meeting called for the purpose of increasing the capital.  A proposed increase, which would be carried against the resistance of the plaintiffs alone, might be defeated by the arguments and votes of others, if all were notified of the business to be done.  If the passenger and freight stations in Concord were burned, the complaint of a single stockholder that a fire-bell was not rung would not be answered by proof that he had all the knowledge any alarm would have given him, and was present and endeavored to save the property from destruction.  If the presence of all the stockholders at the October meeting was all the protection the plaintiffs would have received from a meeting specially called, and all they were entitled to, the defence fails because it does not appear that all the stockholders were present.

III.  A stock vote was not taken and does not appear to have been called for.  It would seem that this objection is not seasonable because not made at the meeting, when it could have been obviated.  As the injunction against the performance of the vote is sustained for insufficiency of notice, it may not be necessary to decide all the questions raised in argument; but of some not yet adverted to, a decision may be needed.  The necessity of an increase of capital authorized by law, is a question left to the judgment of the corporation.  A stockholder does not lose his right to vote by being a director.  The directors were not disqualified to vote as stockholders for the increase.

IV.  Under the partnership contract, the Concord & Montreal, at " any meeting called for the purpose, may increase  .  .  .  its capital stock and the number of shares therein; but the capital stock when so increased shall not exceed the amount authorized by law."  Gen. Laws, c. 148, s. 6.  Under the same contract, it may increase its capital to the amount requisite to buy the twelve roads named in s. 10 of c. 5 of the act of 1889, with a limitation of the dividends payable on the capital thus increased, and a compliance with all the requirements of that chapter.  Chapter 3, Laws 1891, authorizes the Concord & Montreal to " increase its capital not exceeding $3,000,000, to be issued from time to time for the purpose of aiding an extension of the Whitefield & Jefferson Railroad, and of such other branches or leased roads of the Concord & Montreal Railroad as it is or may be authorized to construct, and for the purpose of providing additional depots, yards, and other terminal facilities at Nashua, Manchester, Portsmouth, Concord, Laconia, Lake Village, and elsewhere on the lines of its railroad, of providing additional tracks, wharves, and

coal and other storage facilities at tide-water in Portsmouth, of changing the line and improving the terminal facilities at Groveton village, and for providing additional equipment for its railroad, and for the improvement of its railroad and of other property owned or leased by it."

The plaintiffs contend that for some of the purposes named in the act of 1891 and in the directors' report and recommendation there can be no lawful outlay of capital, old or new, without the unanimous consent of the stockholders, and that for such purposes the capital cannot be increased. Power to increase the capital for the purposes named in the act of 1889 is a part of the partnership contract, but the act of 1891 was passed after the contract was made. Without unanimous consent, the contract could not be altered by a statute permitting the company to build or buy a road not within the scope of the partnership articles. The stockholders' agreement that the company may increase the capital to an amount authorized by law (Gen. Laws, *c.* 148, *s.* 6) gives authority to enlarge, not the sphere of business for which the company was formed, but the capital employed in that business. A statute giving the state's consent to a purchase by the Concord & Montreal of the Boston & Maine road, or the plant of the Amoskeag Manufacturing Co., would not alter the partnership contract in which a corporate authority to make those purchases was not included.

The case does not state all the facts necessary to be known in a consideration of all the items of proposed expenditure of new capital to which the plaintiffs object. The increase was voted "for the purpose of providing for expenditures authorized by law." The amount of increase corresponds with the directors' recommendation; and the natural inference is, that the company intended to expend the new capital for the eleven purposes recommended by the directors. Case, *pp.* 9, 10. The first item is "Extension of Whitefield & Jefferson Railroad to Berlin." The report states that this piece of road "is now in process of construction, and will be ready for business about July 1, 1892." If the facts are what this statement seems to indicate, the objection to this item is not seasonably made. *Chamberlain* v. *Lyndeborough*, 64 N. H. 563; *Hoyt* v. *Latham*, 143 U. S. 553. The second item is "To acquire the Profile & Franconia Notch Railroad property." This is one of the twelve roads named in *s.* 10 of the act of 1889. The third item is "One half in the Franklin & Tilton Railroad, built by this corporation and the Boston & Maine . . . and now substantially completed." This is a branch of the Concord & Montreal, and if it is substantially completed, it is too late to object to the investment. The fourth item is the completion and improvement of "the Lake Shore Railroad, owned by the corporation." The completion and improvement of the Lake Shore, like the completion and improvement of the Montreal

and the Concord, is within the scope of the partnership contract. The facts relating to the fifth and sixth items are not stated in the case.    To the other five items it does not appear that any valid objection can be made.  If another vote is passed to increase the capital, it may take a form that will not require further consi,deration of the details of the directors' report.  A vote like that of October, " for  .  .  .  expenditures authorized by law," might be valid even if the plaintiffs should obtain an injunction against some investments which the company proposed to make. The company's scheme might embrace an amount of lawful outlays that would absorb all the new capital.

*Decree for the plaintiff.*

CHASE, J., did not sit: the others concurred.