ENOS A. WALL

*v.*

THE UTAH COPPER COMPANY et al.

[Submitted September 29th, 1905.   Decided October 2d, 1905.]

Each stockholder in a corporation, all of whose capital stock has been issued, is entitled to share in any additional or new stock proposed to be issued, in proportion to the amount of his present holdings in the existing issue, upon the same terms that the new stock shall be issued to other parties.   An issue of bonds containing the privilege to the holder to convert the same into stock amounts to an issue of stock, and can only be issued subject to the right of each stockholder to share ratably therein.

---

On order to show cause why injunction should not issue. Heard on bill and one affidavit, and one affidavit in opposition thereto.

*Mr. Edward A. Day* and *Mr. Gilbert Collins*, for the complainant.

*Mr. Robert H. McCarter* and *Mr. Thomas Thatcher* (of the New York bar), for the defendants.

PITNEY, V. C.

The complainant, Wall, a resident of Salt Lake City, Utah, is a holder of ninety thousand shares (par value, $900,000), being one-fifth of the capital stock of the defendant the Utah Copper Company, a corporation of this state, and is one of the seven directors thereof, and also vice president thereof.

The defendants, six in number, other than the corporation, are the other directors thereof, and the defendant MacNeill is the president thereof.

On the 11th of September the complainant presented his bill, with one affidavit annexed, the object of which is to restrain

2

the issuing by the corporation of $3,000,000 of bonds, secured by a mortgage, which bonds shall contain a clause giving the holders an option to convert the same into the stock of the company on certain terms presently to be stated. An order to show cause, with interim restraint, was granted thereon, returnable on the 22d instant.

On the return day of the order the defendants appeared and filed one affidavit in answer to the allegations of the bill. That affidavit had not been previously served upon the complainant, and upon being read by his counsel it was discovered that it contained new matters not in direct reply to those set forth in the bill, and apparently not within the knowledge of complainant. The complainant did not ask for time to answer this new matter, but submitted to the argument being had upon the papers, including the new matter, upon the understanding, of course, that he was to have the benefit, if any, of the new matter, in all respects as if he had set it out and relied upon it in his bill, and the bill might be considered as amended accordingly.

The facts are that the whole of the capital stock, $4,500,000, provided for by the articles of association, was duly issued, and the proceeds invested in a copper mine and property near the town of Bingham, in the county of Salt Lake, in the State of Utah, and about twenty-five miles southwest of Salt Lake. The mine, so far as developed, has proved very promising and profitable in its working, and can be made still more profitable by a judicious expenditure of money in the erection of a large smelting works on the shore of Salt Lake and a railroad from the mine to it. The whole encumbrance at present is $750,000.

The defendants MacNeill & Penrose are the largest holders of stock except the complainant.

On the 7th of July, 1905, MacNeill & Penrose, on the one part, entered into a written agreement with the Guggenheim Exploration Company, a corporation of New Jersey, of the other part, by which it was agreed that MacNeill & Penrose should cause the defendant corporation to authorize an issue of $3,000,000 of the par value of its bonds of $1,000 each, payable in ten years, with interest at six per cent., and secured by a mortgage to the Morton Trust Company, each of which bonds

"shall be convertible, at the option of the holder, at any time within five years from the date thereof, into fifty (50) shares, of the par value of ten dollars ($10) each, of the stock of said copper company."

The agreement further provided that MacNeill & Penrose should cause the defendant company and its stockholders forthwith to take proceedings to increase its capital stock to the extent required for the proposed conversion of bonds into capital stock, and to authorize the issue of such increased stock in exchange or in lieu of the convertible bonds. This, it will be seen, will require a provision for the issue of $1,500,000 of new stock, increasing the total issue from $4,500,000 to $6,000,000.

The contract further provided that the defendant corporation should agree in writing to give the exploration company the right to take the whole issue of bonds at ninety-eight cents on the dollar.

MacNeill & Penrose further agreed to give the exploration company the option to purchase from them one hundred and fifty-six thousand shares of the stock of the company (par value, $10) at $20 per share.

The result of this agreement, so far, if carried out, would be to give the exploration company the right, by virtue of its ownership of $3,000,000 of convertible bonds, to acquire $1,500,000 of the new stock of the company, which would thereby be increased to $6,000,000, and by the delivery to it of one hundred and fifty-six thousand shares of present existing stock to make it the owner of $3,600,000, which will be a majority of the whole issue of $6,000,000.

The contract contains the further provision that MacNeill & Penrose should have the right and option to take on their own account one-half ($1,500,000) of the whole issue of $3,000,000 of bonds, upon condition that if they should exercise the option and convert the bonds into stock they should sell and transfer a certain portion of the stock to the exploration company, at $20 per share.

In pursuance of this agreement the president, on the 14th of July, 1905, issued a call for a meeting of the directors of the

defendant company, to be held on Saturday, the 22d of July, at Colorado Springs, for the following purposes:

*First.* To consider the advisability of, and, if deemed advisable, to authorize an issue and sale of $3,000,000, par value, bonds of the company, to be secured by mortgage on all of the property now owned by the company, and which may be acquired by it in the future, and to decide upon the rate of interest, time and terms of said proposed issue.

*Second.* In the event the bond issue, as above, be authorized by the board of directors, then to authorize the calling of a stockholders' meeting for the purpose of ratifying the action of the board of directors in authorizing and providing for the issuance and sale of the aforesaid bonds, if necessary, and to transact any and all other business connected therewith or incident thereto which, in the judgment of the board of directors, or under the charter or by-laws of the company, or under the laws of the State of New Jersey, it is necessary to submit to the stockholders of the company.

*Third.* To transact any and all business pertaining to the affairs of the company which may be brought to the attention of the board of directors.

Complainant in his bill alleges that he was unable to attend that meeting, "but that he protested in writing against the proposed action to be taken thereat, giving his reasons for his said protest." This written protest was not produced at the hearing, though it was not disputed that it had been received by the defendant officers of the corporation.

On the 26th of July a meeting of the board of directors, adjourned from the 22d, was held at the office of the company at Colorado Springs, at which meeting were present four of the directors—MacNeill, Hawkins, Babbitt and Jackling—Messrs. Penrose, McLaren and the complainant being absent.

Mr. McLaren is the New Jersey director, and holds only so much stock as to qualify him as such.

At that meeting the minutes show that the president, MacNeill, laid before the meeting a proposed agreement to be entered into between the defendant company and the exploration company, and called attention to the fact that its performance would

require the issue of bonds convertible into stock, and this would necessitate a corresponding increase in the stock, whereupon it was resolved that the agreement be approved and the officers of the company authorized to execute the same.

Then follows in the minutes a formal resolution, subject to the ratification of the stockholders, for the borrowing of $3,-000,000, secured by bonds, convertible into the stock of the company, at the rate of $500, par value, of the stock of the corporation for each $1,000 bond, at the option of the holder.

It was further resolved that it was advisable that the capital stock of the corporation should be increased from $4,500,000 to $6,000,000, and the fourth paragraph or section of its certificate of incorporation should be amended accordingly, specifying the amendment, and it was further resolved that a special meeting of the stockholders be called, to be held at its office in Jersey City, on September 5th, to take action upon the increase of stock and the issuing of bonds.

The proposed agreement to be executed, and which was in fact executed, between the copper company and the exploration company, is in substance the same as that entered into on the 7th of July between MacNeill & Penrose and the exploration company, except that it does not mention those provisions of the first agreement which enabled the exploration company to become the holder of a majority of stock of the defendant company, and does not mention that provision which gives MacNeill & Penrose an interest with the exploration company in the new issue of convertible bonds.

Immediately after the meeting of the directors last stated, to wit, on August 1st, a notice was sent out to the stockholders for a meeting, to be held on September 5th, at Jersey City, to take action upon the proposed increase of the capital stock from $4,500,000 to $6,000,000, and also upon the proposed issue of $3,000,000 of convertible bonds of the character previously stated.

Complainant received this notice on the 2d of August, and had an interview as soon as practicable with the defendant MacNeill, and protested to him personally against the proposed action, and was informed, as he understood, by MacNeill that

he (complainant) would have no right to his proportionate share or any of the proposed increased stock or issue of convertible bonds unless he would join with MacNeill and the other stockholders of the company in giving an option of a purchase of fifty-one per cent. of his holdings of stock to the American Smelters Security Company, at $19.60 a share.

So far as the case shows, this was the first notice complainant had of the proposition to issue convertible bonds and to give some other company the control of a majority of the stock of the defendant company.

In order to protect himself complainant sent an attorney to the meeting of the stockholders held in pursuance of the notice and submitted a written protest there, the material parts of which are as follows:

"The plan for the subscription to, and distribution of, the said proposed increased shares of stock prevents any stockholders, myself included, from subscribing for his *pro rata* share thereof unless he shall agree to sell, assign or exchange one-half of fifty-one per cent., or some share of his present holdings, for mortgage bonds of said company; whereas, I am advised that any stockholder, myself included, has the legal right to subscribe for such proportionate number of said increased shares as his present holdings of stock bear to the present number of shares in said company, unconditionally.

"I object to and protest against such proposed increase of said capital stock for the further reason that the proposed plan of sale, distribution and exchange thereof compels a subscribing stockholder to pay more than the par value for shares subscribed for by him; whereas I am advised any stockholder, myself included, has the legal right to subscribe for and have such increased shares at their par value, the exercise of which right I respectfully insist shall be accorded me.

"I am now the holder of one-fifth, or twenty per cent., of the present number of shares of the company, and the proposed sale, distribution and exchange of such increased stock will diminish my holdings from twenty to but fifteen per cent., as respects the whole number of shares in said company, thereby reducing the value of my shares by twenty-five per cent.; and said plan will, to the same extent, diminish the voting power of my said holdings in said corporation.

"I further object and protest against said proposed plan because the proposed issue, distribution and exchange of said new shares is to be made upon the illegal consideration that the company will thereby barter such increased shares of stock of the corporation for the purpose of enabling the president and officers, and other stockholders of the corporation, to make a sale and exchange of their own present holdings and stock in said company.

"I further object to and protest against the issue of said increased

capital stock, and the borrowing of the sum of three million dollars upon the proposed plan, or at all, because the mine and mill of the company at Bingham are capable of earning, if the same are operated with ordinary skill and ability, sufficient money to meet the cost of the proposed improvements.

"I further object and protest against the proposed plan because the fact is that the sum of $3,000,000, after deducting the $750,000 for paying the existing mortgage indebtedness, is far in excess of the requirements of said company for making such improvements; that said improvements consist mainly of two items, as follows: (1) the building of a railroad from the mine at Bingham to the site of the proposed new mill, on the south shore of Great Salt lake; (2) the building of said mill and its appurtenant power plant; that the said railroad can be built and equipped with rolling stock for a sum not to exceed $350,000; that I have offered to, and do now hereby offer, to build and equip the same as aforesaid for said company for the sum of $350,000; that said mill can be built and equipped with first-class, modern machinery and appliances, adapted to all the uses required of it, for a sum not exceeding $750,000, and I have offered, and do hereby offer, to construct the same in manner aforesaid for said sum.

"I further object and protest because the fact is, as I am informed and believe, that money to the extent of $4,000,000 on the simple contract notes of said company can be borrowed at the rate of five per cent. per annum, from a company financially responsible, to wit, the General Electric Company, conditioned only that the company will sell, at market rates, its copper product to the General Electric Company.

"The increased stock can be sold at par for more money than is needed to pay the expense of said improvements.

"I further protest and object against said proposed action by the company because I have been, and am now ready, able and willing to contribute my share of one-fifth of the money necessary to pay the expense of said proposed improvements upon the plant of the company, as well as the payment of said mortgage indebtedness.

"That the notice of the directors' meeting, at which the issue of the bonds and stock now contemplated was recommended, contained no reference to or notification of the proposed increase of stock, and that therefore the proposed proceedings to increase said stock are illegal and void; and

"That there is no warrant at law for the issue of bonds of the tenor and effect set out in the notice of this meeting, and that such bonds, if issued, will be illegal and void."

Several objections are made by complainant to the proposed proceedings.

First, it is objected that the notice of the meeting of directors sent to the complainant is insufficient, in that it does not set forth truly and fully the business to be brought before the directors.

It will be remembered that the notice is confined to specifying the mere issue of bonds to be secured by mortgage, and the rate of interest and term of the bonds, and to authorize the calling of the stockholders' meeting to ratify the action of the board.

The other contents of the notice are quite general.

There is nothing in it to indicate that an increase of capital stock was contemplated, or that it was proposed to issue the bonds and negotiate them in a mass to one party.

Now, it will be observed that the twenty-seventh section of the Corporation act, which authorizes an increase of capital stock, prescribes the mode in which it shall be done. The board of directors must pass a resolution declaring that such increase is advisable and calling a meeting of stockholders to take action thereon.

Counsel for complainant draws a clear distinction between meetings of directors held for the purpose of supervising and directing the ordinary business transactions of the company, and providing for such emergencies and exigencies as may arise therein, and a meeting of directors to consider the matters provided for in section 27, and they contend, and I think rightly, that while little or even no notice is required to be given to each director of a meeting to transact business of the former character, a special notice is not only proper, but necessary, to be given in the latter case, and that such notice should state fully the object of the meeting, so that each director may be informed in advance and fully appreciate the importance of his personal attendance. The defendants seem to have felt the force of these considerations, for they did attempt to state the object of the meeting, and the complaint of Colonel Wall is that they did not state it fully.

It seems clear enough, from the affidavits and the statements of counsel, that he was aware of the desire of the other directors to increase the indebtedness of the company, and may have thought that it was useless, even if it were practicable for him to leave his home and place of business at Salt Lake City, near the works of the corporation, and travel several hundred miles to Colorado Springs, to oppose the issue of bonds, and therefore contented himself with a written protest, while, if he had known

that the scheme included the issuing of $1,500,000 more stock, and placing that stock under the control of a single corporation, he would have attended the meeting and exercised his influence by argument against it.

This was his undoubted right, and it is no argument against his exercising it to say that it is quite clear that it would have been unavailing. The law presumes that the result of a meeting of a body of that kind cannot be determined with judicial certainty by canvassing the individual views of the members, but that in law it depends upon a conference of the several members, met as a body, after an interchange of views and of arguments.

It is impossible to hold that the presence of Colonel Wall at the meeting of directors here relied on might not have changed the result. I can see no reason why Colonel Wall should not have been apprised, not only of the proposed contract of July 26th between the copper company and the exploration company, but also of the previous contract of July 7th between MacNeill & Penrose and the exploration company.

I do not deem it necessary, at present, to express any definite opinion on this objection.

The next objection is that the meeting of directors in question was invalid because not held by a quorum of directors competent to vote thereat on the matter before them. Only four were present, a bare quorum. Of these four, complainants contend that MacNeill was incompetent by reason of his personal interest in the question before the board.

This allegation of interest is based on the sixth paragraph of the contract of July 7th, heretofore mentioned. By that paragraph the exploration company agreed that MacNeill & Penrose may take the whole or any part of $1,500,000 of the convertible bonds, upon condition that they shall sell to the exploration company one-half of such stock as they shall receive from the company under the option of conversion to be inserted in the bonds.

I may not have properly construed the section, but it certainly does give Messrs. MacNeill & Penrose a personal interest in the transaction, and complainant claims that it is fatal to the resolution in question, upon the principle laid down in the

books that "a director who is disqualified by reason of personal interest in a matter before a directors' meeting, loses *pro hac vice* his character as director, and he cannot be counted for the purpose of making out a quorum." This principle was acted upon and approved by our court of errors and appeals in *Metropolitan Telephone and Telegraph Co.* v. *Domestic Telegraph and Telephone Co., 44 N. J. Eq. (17 Stew.) 568* (at *p. 573*).

The answer made by defendants to this position is that this reservation to MacNeill & Penrose was intended by them to be held in trust for the benefit of all the other stockholders who chose to come in and take a share of it and contribute towards making up the one hundred and fifty-six thousand shares of stock which they had agreed to sell to the exploration company, in order to give them the majority of all the stock.

Complainant's answer to this is that there is nothing in writing, signed by either MacNeill or Penrose, by which this trust can be established.

So far as appears to the court, it is supported only by the affidavit of Mr. Babbitt, one of the directors, and the counsel of the company.

It probably furnishes the explanation of the complainant's allegation that he was told by MacNeill, or some one representing him, that he could only obtain his share in the new issue of bonds by contributing shares of stock toward making up the fifty-one per cent. of the whole issue required by the exploration company. I shall not express any definite opinion upon this point made by the complainant at this stage of the cause.

The next point made by the complainant is that there is no authority by the common law or by our statute for issuing convertible bonds of this character. They argue, and rightly, that the right to issue bonds and secure them by mortgage is not given by any statute, but rests entirely upon the common law right of a corporation to incur indebtedness, and that right does not include a right to issue bonds convertible into stock.

In this connection reference was made at the argument to the second section of the act of March 28th, 1902. *P. L. 1902 p. 217.* That section, as is well known, was supposed to have been passed at the instance of the great steel trust, and came under

review in the case of *Berger* v. *United States Steel Corporation,* *63 N. J. Eq. (18 Dick.)* *506,* by Vice-Chancellor Emery, and again (at *p. 809*) by the court of errors and appeals. But that act, by its terms, provides for convertible bonds issued by a corporation having certain qualifications and characteristics which the present corporation in question does not possess. I do not deem it necessary to express any definite opinion at this time on this objection.

The last and most serious objection urged by complainant is that the proposed action will deprive him of a clear and indisputable right which he has by the law of the land to participate in any issue of new stock to an extent measured by the comparative amount of his present holdings of stock, and upon the same terms that other parties shall participate therein. In other words, that he is entitled to an opportunity to take and pay for one-fifth of the proposed new issue, and that the contract to dispose of all that issue to the exploration company infringes on that right.

This right, as I understand it, is based on two grounds.

*First.* That the complainant became the owner of one-fifth of the property of this corporation with the full understanding that he would thereby have a voice and influence in its management due, among other things, to that share, and that an increase of the stock issued to other people will diminish his voice and influence just so much.

*Second.* That at present he is entitled by law to one-fifth of the whole property of the corporation, whatever may be its value, and he is entitled to one-fifth of any increase of that value, whether such increase be due to the accumulation of actual earnings or to anticipated increase as the effect of the knowledge, by physical development, of its present value, and any issue of capital stock is of necessity a diminution of his share in that increase, and that in order to protect him against an undervaluation of the new stock to be issued, however that undervaluation may arise, he is entitled to the privilege of taking a proportionate share of the new stock, and especially is he so entitled in the present case, where there is no present sale of the new stock at an appraised value, but where an option is given

to purchase at any time within five years, at a price now fixed, and which, when the option comes to be exercised, may prove to be entirely inadequate. Thus the holder of the option will have the whole of five years, during which the mining property is being developed, to ascertain and determine whether it is worth while for it to exercise its option. If the property does not improve in value and the stock is not worth $20 per share, it will not exercise its option, but will enforce the payment of the bond. If, on the other hand, the property does, either by its development or by the addition of undivided earnings, increase in value so as to be worth, as it may, many times the price fixed, it will exercise its option, and in such case it will gain at the expense and loss of the complainant.

The complainant's contention is, in my judgment, thoroughly based upon justice and law.

The leading case, of course, upon the subject is *Gray v. Portland Bank, 3 Mass. 364 (1807)*. There the bank was organized with $100,000 capital, with the privilege by its charter to increase it to $300,000. After it had been in successful operation for several years, and the stock was worth something more than par, the directors resolved to issue the remaining stock, as I read the case, at par. The plaintiff demanded the right to take his share, which was $14,000, in the new stock and was refused, whereupon he brought his suit against the bank for damages, and recovered. The case was elaborately argued and opinions delivered by two judges, putting his right on substantially the grounds above stated.

That case has been followed with almost unbroken uniformity in most of the states of the union.

Mr. Morawetz, in his valuable work on corporations (*Morawetz Corp.* §§ 454, 455), states the rule as follows:

"When a corporation declares a stock dividend in wholly or partially paid-up shares, the new shares are paid up in the whole or in part out of the profits which belong to the existing shareholders. It is evident, therefore, that each shareholder is entitled to share in the dividend, to the same extent as if it were paid in cash.

"It is equally clear that a corporation cannot issue new shares at less than their full market value, except by equal distribution among all the

shareholders, for whatever the new shares are worth is represented by capital or profits belonging in equity to the existing shareholders.

"It seems that if a corporation resolves to increase the amount of its capital by issuing and selling new shares, every stockholder has a right of pre-emption of a fractional part of the new issue, proportionate to his fractional share in the company's entire stock. Each stockholder is thus enabled to preserve unimpaired his voice in the management of the company's affairs."

To the same effect is *Ang. & A. Corp.* §§ *554, 555;* also *2 Beach Corp.* § *473.* Mr. Cook, in his book (*Cook Stock.* § *286*), lays down the same rule. To the same effect is Mr. Thompson's elaborate book (*2 Thomp. Corp. Off.* § *2094*).

Numerous adjudged cases were cited by counsel for the complainant in support of the general proposition, of which I will mention a few.

One is *Jones* v. *Concord and Montreal Railroad, 67 N. H. 119; 38 Atl. Rep. 120.*

In the very recent case of *Electric Company of America* v. *Edison Electric Illuminating Co., 200 Pa. St. 516; 50 Atl. Rep. 164 (1901),* the question came under consideration in the review by the supreme court of a learned opinion of the presiding judge of the common pleas of Blair county. He there cites the authority of several text-writers and refers to previous decisions in Pennsylvania, and holds to the rule as laid down by the text-writers, and his decree was sustained on appeal by the supreme court for the reasons given in the court below. The head-note is this: "Stockholders have a right to purchase a *pro rata* share of a new issue of stock, so that the directors may not provide that the new issue shall be sold to the one making the highest secret bid." There the complainants already held a majority of the stock, but had only a minority in the board of directors. That body, by a majority vote, resolved to issue new stock and sell it to the person who would make the highest sealed bid for it. This action was restrained by the court.

In our own state we have the case of *Way* v. *American Grease Co., 60 N. J. Eq. (15 Dick.) 263,* decided by Vice-Chancellor Grey in 1900. The head-note is this: "The directors of a corporation which is fully organized and in the active conduct of its business are bound to afford to existing stockholders an oppor-

tunity to subscribe for any new issue of shares of its capital stock, in proportion to their holdings, before disposing of such new shares in any other way." In support of that proposition, he cites (*p. 269*) *Gray* v. *Portland Bank*. It is true that there were circumstances of actual fraud found in that case, but the principle applies to the present case.

I understand that the court of errors and appeals acted upon the same principle in *Berger* v. *United States Steel Corporation*, *63 N. J. Eq. (18 Dick.) 809*. The first two head-notes are to that effect.

Against this doctrine defendants rely on the case of *Meredith* v. *New Jersey Zinc and Iron Co., 55 N. J. Eq. (10 Dick.) 211*, decided by myself, and affirmed on appeal, *56 N. J. Eq. (11 Dick.) 454*, on my opinion. What is expressly relied upon is found upon *p. 220, 55 N. J. Eq. (10 Dick.)*, and counsel seem to think that the interpolation of the words in parentheses, "if there be such," after the words "general rule," manifested a doubt in my mind as to its existence. It is proper for me to say here that what I there said was the result of not more than ten minutes of consideration, and the only study given to the question was the reading of the section referred to in *2 Beach Corp.* And if I had then had at command time to give the subject proper consideration, I am not at all sure that I should have dictated the sentence which immediately follows the citation of the Massachusetts case, which was not necessary for the decision of the cause. But be that as it may, the reading of the whole case shows that it is quite different from the one in hand. In the first place, the complainants were the holders of less than one per cent. of the whole stock of the corporation. In the second place, the defendants offered at the hearing to give them an opportunity to purchase their proportion of the new stock at par. In the third place, the property purchased had been appraised in the most careful manner and bargained to be purchased between parties entirely at arms' length, excluding the least suspicion that the element existed of a party making a contract with himself.

In the present case there is no purchase of property, no appraisement of value by disinterested parties; but a simple, clear

contract to give a third party the absolute right, by way of option, to purchase stock of a corporation, at a price now fixed, if at a future day that party should feel it his interest to make the purchase. I think that not only is that in direct violation of the complainant's individual right as a stockholder, even if it were an issue of stock *in præsenti* for a fixed price, but that the optional character of the contract is vicious in itself, and not warranted by that clause in the statute which authorizes the creation and issue of new stock.

Against the general line of authority above cited defendant relies upon the very recent case of *Stokes* v. *Continental Trust Co.,* decided by the appellate division of the New York supreme court, *99 App. Div. 377.* I might dismiss the case by saying that the point here involved was not before that court in that cause, and that a careful examination of the reasoning of the several judges tends to help the complainant herein, rather than the defendant. It was a suit brought by Stokes against the trust company to recover damages against it for not issuing to him at par his proportion of a new issue of stock, such damages to be measured by the difference between the par value of $100 per share and the price at which the new stock was actually sold—$450 per share. At the time when the transaction occurred the book value of the stock was about $310. At that time the firm of Blair & Company proposed to buy five thousand shares of new stock at $450 per share, the result being a doubling of the amount of stock and increasing its book value considerably, and the market value was increased far beyond its book value. The plaintiff claimed the right to a proportionate amount of the new stock at par on the day of its issue. He never demanded the right to take any part of it at the price paid by Blair & Company, or offered to do so. The trial judge sustained the plaintiff's claim and directed judgment to be entered against the defendant for the difference between the par value of the complainant's two hundred and twenty-one shares, namely, $22,100, and the actual market value, fixed by stipulation at $550 per share, which judgment amounted to $115,151.07. It seems to me that such a judgment could not stand the test of reason for

a moment. The mere statement of the case shows its utter indefensibility.

The leading opinion of the supreme court was written by Justice O'Brien. He reviews all the cases in New York and expresses some doubt upon the soundness of much that has been written and decided upon the question, and then calls attention to the peculiar claim of the plaintiff to subscribe for the stock at par and his failure to offer to pay the same price as Blair & Company paid, and then proceeds as follows:

"Much might be said, and considerable force may be derived from the views of text-writers and from the expressions in opinions in support of the proposition that a stockholder, as against an outsider, has a primary or pre-emptive right to subscribe for any increase of stock made by the corporation. This primary or pre-emptive right, however, to subscribe at par for increased stock which is to be issued at par, or, where the value of the stock is greater than its par value, and it is proposed to issue it at its greater price, to subscribe for it at such price, in preference to outsiders, is quite different and distinct from the right here claimed, which is that of a stockholder to have at par stock which is worth, or can be sold, in the interest and for the benefit of the corporation to others, for four and a half times its par value. We do not think, in the absence of any statute of the state conferring such right, or provision in the charter of the corporation, or in the resolution authorizing the increase, or of fraud or illegality in making the increase, that this contention as to the right of a stockholder which the plaintiff here asserts can be sustained either in law or in reason."

In this opinion Justices VanBrunt and Hatch concurred; Justice Paterson concurred in the result, and Justice Laughlin gave his own reasons. Speaking of the power to issue stock where there is a minority against it, he uses this language, which seems to me to express the rule accurately and tersely:

"In that event I think the statute confers implied power upon the majority to determine whether the stock shall be issued at par or above par, at what may be deemed its actual value, in view of the value of the assets of the existing cor-

poration, the right to ultimately share in which the holders of the new issue of stock will thus acquire. The action must be taken, however, in a manner that will secure to the existing stockholders an opportunity of exercising their pre-emptive right of subscribing for a share of the increased capital stock in proportion to their holdings of the original. I think, for instance, that the sale of the new stock to the highest bidder, upon sealed proposals, would be a violation of this right. A stockholder prior to the increase has a right to a voice in the management and to a share of the assets of the corporation, on final dissolution, in the proportion that his holdings bear to the entire outstanding capital. These rights are materially affected by an increase of the capital stock, and such increase must therefore be made in a manner to enable him to become the purchaser of such a proportion of the increased capital stock as will preserve his right to the same proportion in the assets on final liquidation as he originally had, and also the same voice in the management of the corporation. Moreover, the immediate effect of an increase in the capital stock of a corporation, the value of which is above par, would be to depreciate the value of the original stock, unless the new capital is issued and sold at a valuation equal to that of the original issue. It is therefore manifest that if the holders of the original stock are not to purchase the entire new issue, it is to their interests that the increase of stock be issued, not at par, but at what will be its actual value, as near as the same may be ascertained."

For the reasons above set forth, I am of the opinion that the last objection taken by the complainant to these proceedings is fatal, and, without expressing any opinion upon the other objections made, that an injunction must go until the time of the hearing.