Charles L. GRIMES and Jane Gillespie Grimes, Plaintiffs Below, Appellants,

v.

ALTEON INC., Defendant Below, Appellee.

No. 194, 2001.

Supreme Court of Delaware.

Submitted: April 23, 2002.
Decided: July 19, 2002.

David A. Jenkins (argued) and Michele C. Gott of Smith, Katzenstein & Furlow, LLP, Wilmington, Delaware, for the Appellants.

Vernon R. Proctor, Kurt M. Heyman, and Patricia L. Enerio of the Bayard Firm, Wilmington, Delaware; Adam D. Cole (argued), Karen Y. Bitar, and David

Neier, of Greenberg Traurig, LLP, New York City, of counsel, for the Appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER and STEELE, Justices, constituting the Court en Banc.

VEASEY, Chief Justice:

The issue in this case is whether an alleged oral promise made to a stockholder by the CEO of a corporation to sell 10% of the corporation's future private stock offering to the stockholder, when coupled with a corresponding oral promise by the stockholder to buy that 10%, is enforceable where there has been no approval of the agreement by the board of directors and the agreement is not memorialized in a written instrument. The Court of Chancery held that the oral agreement between the stockholder and the CEO is unenforceable. We agree.

We so conclude on several grounds that are consistent with the holding of the Court of Chancery that the bilateral oral agreement creates a "right" to require the corporation to issue stock to the plaintiff within the meaning of Section 157 of the Delaware General Corporation Law, and is invalid under that section for lack of board approval and a writing. The relevant statutory scheme, including Section 157 and other provisions of the Corporation Law, establishes a policy that commitments regarding the issuance of stock must be approved in writing by the board of directors. This policy seeks to preserve the board's broad authority over the corpora-

tion and to protect the certainty of investors' expectations regarding stock.

Thus, based on the statutory structure of the Corporation Law as a whole, we affirm the judgment of the Court of Chancery.

### Facts [1]

Alteon Inc., defendant below and appellee, is a pharmaceutical company specializing in drugs for cardiovascular and renal diseases. Charles L. Grimes, plaintiff below and appellant, is a lawyer and an investor who, along with his wife, Jane Gillespie Grimes, often purchases large blocks of stock (but below 10% to avoid insider obligations) in small technology-based companies. Grimes and his wife had held approximately 9.9% of Alteon's stock at the time of the events that have given rise to this litigation. Those events, as set forth in the complaint, may be summarized as follows.

Kenneth I. Moch, the President and Chief Executive Officer of Alteon, told Grimes that Alteon needed additional funds, and that Alteon was considering a private placement stock offering. Grimes told Moch that he was concerned about his holdings being diluted, and that he would buy 10% of any such offering. According to Grimes, Moch promised orally that he would offer Grimes 10% of the offering. In return, Grimes promised orally to buy 10% of the offering. Grimes admits that there is no writing memorializing these promises. He also admits that Alteon's board did not approve this transaction.

Subsequently, Alteon publicly announced a private placement offering.[2] It

---

1. These proceedings are on a motion to dismiss under Court of Chancery Rule 12(b)(6). Thus, the only factual record in this case is Grimes' complaint, the allegations of which are taken as true for purposes of the motion.

2. Alteon publicly announced that it had entered into an agreement to raise $6,235,000 through a private placement of $2,834,088 shares of common stock at $2.20 per share. The purchasers also received warrants to purchase certain additional shares at $3.40 per share.

did not allow Grimes to participate in this private placement, which presumably was fully taken by other purchasers. The stock market reacted positively to the placement, and Alteon's stock price increased from $3 to as high as $5–5/16 per share.

### Decision of the Court of Chancery

Grimes sued Alteon in the Delaware Court of Chancery for damages and specific performance of the oral agreement between Grimes and Moch. Alteon moved to dismiss the complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim on which relief may be granted. The motion made three arguments. First, Alteon argued that any agreement between Grimes and Moch constituted a "right" under 8 *Del. C.* § 157, and is thus invalid because it is not written and was not approved by the board of directors. Second, Alteon argued that the agreement was a "preemptive right" under 8 *Del. C.* § 102(b)(3) and is thus invalid because it was not expressly provided in Alteon's certificate of incorporation. Third, Alteon argued that the agreement is too indefinite as to time, quantity, and price to constitute an enforceable contract. The Court of Chancery accepted the first ground and granted the motion to dismiss on that basis. The Court rejected the second ground, but stated that it is "highly questionable whether or not this would constitute a valid common law contract." [3] Because of our disposition of this case, we need not reach the second and third issues.

The Vice Chancellor's rationale is expressed in a brief bench ruling holding that the agreement constituted a "right" within the meaning of 8 *Del. C.* § 157, and thus fails for lack of board approval and a written document evidencing it. [4] The essence of the Vice Chancellor's bench ruling is as follows:

I do agree with the defendants, however, that the right that is sought to be enforced here is a "right" within the meaning of Section 157. I am also satisfied that the intent of Section 157—that is, that the overall statutory scheme that's contemplated by Section 157 and also by Section 161—is that whenever investors are contracting to invest capital in a company or to purchase stock either directly or rights or options in stock, that the statutory scheme requires board approval and that there be a written instrument that evidences those arrangements. The reason is that where the overall capital structure of the corporation is concerned, it is a vitally important command of the law that the corporation know precisely what its capital stock is and what the potential calls on that capital will be. And it is for that reason the statute elevates that type of transaction to the level of requiring board approval and of requiring a writing. Only then will everyone know what claims on the capital will be, who has rights to invest capital, and what rights the corporation has with respect to actual or potential investors—that is, investors who have entered into contracts with the company. [5]

Grimes has appealed to this Court the judgment of the Court of Chancery dismissing his complaint. We agree with the essential holding of the Court of Chancery that the agreement is invalid because it was not approved by the board of directors and was not memorialized in a written instrument. We do so based on the statu-

3. *Grimes v. Alteon,* Del. Ch., C.A. No. 18442-NC, at 60 (April 11, 2001) (bench ruling).

4. *Id.* at 60–61.

5. *Id.* at 60.

tory scheme of the Corporation Law pertaining to stock issuance, with particular emphasis on Sections 152 and 157.

### Stock Issuance and the Delaware General Corporation Law Statutory Scheme

Grimes argues that his arrangement with Moch does not constitute a "right" within the meaning of 8 *Del. C.* § 157 and, therefore, need not be approved by the board or evidenced by a written instrument as required by that statute. Alteon argues that it does. Grimes argues that Section 157 applies only to options and "option like" rights. The fatal defect in Grimes' claim is that the agreement purports to grant a right that was not expressly approved by the board of directors as required by the statutory scheme of the Delaware General Corporation Law exemplified by Section 152 and Section 157.

The agreement purports to bind the corporation to issue to Grimes 10% of a future issuance of stock. Grimes' right to require the issuance of stock to him arises only if and when there is a public or private offering of newly issued stock. Because Grimes claims a right to require the issuance to him of 10% of any such offering, the Corporation Law applies and requires that the agreement and the issuance of the stock must be approved by the board of directors and evidenced by a written instrument.

■ One must read in pari materia the relevant statutory provisions of the Corporation Law. First there is the fundamental corporate governance principle set forth in 8 *Del. C.* § 141(a) that the "business and affairs of every corporation ... shall be managed by and under the direction of" the board of directors. One then turns to the board's role in stock issuance set forth in the relevant sections of Subchapter V of Title 8. The provisions in this Subchapter relate to the issuance of capital stock, subscriptions for additional shares, options and rights agreements. Taken together, they are calculated to advance two fundamental policies of the Corporation Law: (1) to consolidate in its board of directors the exclusive authority to govern and regulate a corporation's capital structure; and (2) to ensure certainty in the instruments upon which the corporation's capital structure is based.[6]

■ As this Court has stated in requiring strict adherence to statutory formality in matters relating to the issuance of capital stock, the "issuance of corporate stock is an act of fundamental legal significance having a direct bearing upon questions of corporate governance, control and the capital structure of the enterprise. The law properly requires certainty in such matters."[7] Delaware's statutory structure implements these policies through a "clear and easily followed legal roadmap" of statutory provisions.[8] This statutory scheme consistently requires board approval and a writing.

Various provisions in Subchapter V set forth the formal requirements for the issuance of capital stock, the establishment of classes of stock, the consideration for the issuance of stock, and formalities regarding rights, options and subscriptions relating to capital stock. The statutes relating

---

6. See *Kalageorgi v. Victor Kamkin, Inc.,* 750 A.2d 531, 538–39 (Del.Ch. 1999) (calling capital stock "a species of property right" that is of "foundational importance ... to our economic system"), *aff'd,* 748 A.2d 913 (Del. 2000).

7. *STAAR Surgical Co. v. Waggoner,* 588 A.2d 1130, 1136 (Del. 1991); *accord Kalageorgi,* 750 A.2d at 538.

8. *Kalageorgi,* 750 A.2d at 538.

to the issuance of stock that provide the policy context that is relevant here are 8 *Del. C.* §§ 151, 152, 153, 157, 161 and 166. Taken together, these provisions confirm the board's exclusive authority to issue stock and regulate a corporation's capital structure. To ensure certainty, these provisions contemplate board approval and a written instrument evidencing the relevant transactions affecting issuance of stock and the corporation's capital structure.

Section 151(a), relating to classes and series of stock, states that "the resolution or resolutions providing for the issue of such stock [must be] adopted by the board of directors pursuant to authority expressly vested in it by the provisions of its certificate of incorporation." Section 152, relating to the issuance of stock, states, "The consideration . . . for subscriptions to, or the purchase of, the capital stock to be issued by a corporation shall be paid in such form and in such manner as the board of directors shall determine." Section 153, relating to the consideration for the issuance of stock, requires that such consideration shall be determined from time to time by the board of directors. Section 157, relating to rights and options respecting stock, requires board approval

and a written instrument to create such rights or options. Section 161, relating to the issuance of additional stock, allows the directors to "issue or take subscriptions for additional shares of its capital stock up to the amount authorized in its certificate of incorporation." Section 166, relating to the formalities required of stock subscriptions, provides that subscription agreements are not enforceable against the subscriber unless in writing and signed by the subscriber.

The requirement of board approval for the issuance of stock is not limited to the act of transferring the shares of stock to the would-be stockholder, but includes an antecedent transaction that purports to bind the corporation to do so. As noted, Section 152 requires the directors to determine the "consideration . . . for subscriptions to, or the purchase of, the capital stock" of a corporation. Thus, director approval of the transaction fixing such consideration is required. Moreover, it is well established in the case law that directors must approve a sale of stock.[9] This duty is considered so important that the directors cannot delegate it to the corporation's officers.[10]

---

9. *See Field v. Carlisle*, 68 A.2d 817, 818 (Del. Ch. 1949) holding that a board of directors could not delegate the ability to fix the amount of another corporation's stock to be exchanged for its own, and ruling that "the board of directors of a Delaware corporation [may not] validly execute a contract which provides for a binding determination by a non-director of the value of the consideration to be received for the issuance of its stock"; *Bowen v. Imperial Theatres, Inc.*, 115 A. 918, 920 (Del.Ch. 1922) (a corporation's board of directors must place a value on property acquired in exchange for stock); *OmniOffices, Inc. v. Kaidanow*, 2001 U.S. Dist. Lexis 22421, at *25–26 (D.C.) (applying Delaware law and holding that a board of directors "is statutorily prohibited from delegating the determination of consideration for which the stock is to be issued."); *see also* Melvin Aron Eisenberg,

*Corporations and Other Business Organizations* 108–09 (8th ed. 2000) ("A sale of stock by the corporation is known as an *issuance of stock*."); Model Bus. Corp. Act, § 6.20(e)(1993) ("A subscription agreement entered into after incorporation is a contract between the subscriber and the corporation subject to section 6.21 [entitled, "Issuance of Shares"]."). The board of directors may not need to approve both the terms of a future sale to a stockholder as well as the actual transfer thereof. *See Kalageorgi*, 750 A.2d at 539 n. 10 ("If, of course, the directors validly bound the Company to a contract to sell stock . . . then the board or the Company could be equitably compelled to perform the ministerial act of issuing the promised shares to those parties.")

10. *Field*, 68 A.2d at 818.

Grimes argues that the contract provides "only that *if* Alteon's board should exercise its authority to issue additional Alteon stock in a future private placement (as it did here in the private placement of 2,834,088 shares of common stock), *then* Mr. and Mrs. Grimes were obligated to purchase a certain percentage of that stock at whatever price Alteon's board set. That contract does not give Mr. and Mrs. Grimes the ability to force Alteon to issue additional stock (at any price), and thus does not implicate the board's right to regulate the company's capital structure." [11]

■ This argument begs the fundamental policy question behind the statutory scheme requiring director approval for steps taken in connection with stock issuance. If the corporation is required by the Grimes agreement to issue to Grimes 10% of an offering to sell stock, the board's business judgment is or may be significantly encumbered. For example, the board would not be able to sell 91%–100% of the stock it chooses to issue to another willing purchaser or purchaser in a private placement or otherwise. It may offer those purchasers only 90% of the offering. That constraint may limit the universe of prospective investors to those who would be content to have only 90% of the stock to be issued.

An agreement that binds a company to allow a 10% stockholder to remain at a 10% holding level may be a considerable sacrifice for a corporation, or it may be a good business decision for the board to consider. Focusing, however, on the problematic aspect of such a business decision, it would seem that a 10% holding in a corporation is large enough that the investor may have considerable leverage over

the corporation. Such an agreement is tantamount to an agreement to permit Grimes to have a continuing influence over the future direction of the corporation. Moreover, potential investors might be deterred from investing in a corporation that had made such a commitment. Therefore, the agreement might actually decrease the capital potentially available to a company in a future stock offering. A business decision weighing the advantages and disadvantages of the Grimes transaction would be within the discretion of the board of directors. But that choice lies only in the board's province, not that of the CEO without express board approval.

■ There is an important policy basis for this requirement. Shares of stock are "a species of property right" that is of "foundational importance . . . to our economic system." [12] Thus, it is "critical that the validity of those securities, especially those that are widely traded, not be easily or capriciously called into question." [13] Explicit board approval of a stock issuance or a commitment to issue stock makes it more likely that the board will have considered thoroughly the reasons for and against the issuance. Thus, director approval of stock issuance or agreements affecting the respective rights of the corporation and a putative purchaser of stock reduces later disputes about their propriety and enhances corporate stability and certainty. This policy can be demonstrated by focusing on two of the applicable provisions in the statutory scheme of Subchapter V of the Corporation Law, Sections 152 and 157.

### Section 152

■ This transaction fixed the "form" and "manner" of the consideration Alteon

---

11. Appellant's Rep. Br. at 2.

12. *Kalageorgi,* 750 A.2d at 538.

13. *Id.*

could receive from Grimes, thereby implicating 8 *Del. C.* § 152. That provision states, "The consideration ... for subscriptions to, or the purchase of, the capital stock to be issued by a corporation shall be paid in such form and in such manner as the board of directors shall determine." Regardless of what label is put on the transaction entered into between Grimes and Moch, the transaction contemplated that Grimes would eventually "purchase" the "capital stock" of Alteon, and the agreement constrains the board's determination of the consideration for the issuance of the stock.

This transaction has two features fixing "consideration." First, Alteon bound itself to offer 10% of its stock to Grimes as part of any offering. Second, Alteon could not charge Grimes any more for this 10% than it charged other investors for the remainder.

Both of these features of the transaction served to "cap" the value of the cash consideration Grimes was to give Alteon on the transfer of the stock. This transaction restricted the manner of payment of consideration for Alteon's stock, because it required that it come from Grimes. Because Grimes was a 10% stockholder already, such a commitment could well have tangible negative effects for Alteon's raising of capital from sources other than

Grimes. In essence, the promise to Grimes cost Alteon a certain freedom in raising capital, and could well have lowered the ultimate price Alteon could have charged for its capital stock. Section 152 mandates board approval for such promises relating to consideration, and that approval was absent in this case.

### Section 157

█ Section 157(a) permits a corporation to "create and issue, whether or not in connection with the issue and sale of any shares of stock or other securities of the corporation, rights or options entitling the holders thereof to purchase from the corporation any shares of its stock," provided that "such rights or options [are] evidenced by or in such instrument or instruments as shall be approved by the board of directors." [14] Because it is indisputable that Alteon's board of directors never passed any such resolution approving this transaction, this agreement is invalid if it is a "right" or an "option."

The predecessor provision to Section 157 was first passed in 1929,[15] the first statute in the nation expressly to authorize the issuance of options.[16] Although the Delaware Court of Chancery had recognized the validity of options before the enactment of that provision,[17] the statute was

---

**14.** 8 *Del. C.* § 157.

**15.** 36 *Del. Laws*, c. 135, § 6 (1929).

**16.** *See* Model Bus. Corp. Act § 6.24, cmt. at 400 (1969) (1987 supplement) ("The first statute expressly authorizing the issuance of options, warrants, or rights was enacted in Delaware in 1929, and other states followed shortly thereafter."). The 1927 revision to the Delaware General Corporation Law did not contain a provision relating to rights or options. 35 *Del.Laws* c. 85, § 8 (1927).

**17.** *See Kingston v. Home Life Ins. Co. of Am.,* 101 A. 898 (Del.Ch. 1917). In *Kingston,* another corporation gave the defendant corpora-

tion money in return for "a perpetual and exclusive right to subscribe to the stock of the [defendant corporation] at par ...." *Id.* at 900. The Court of Chancery held that the "stock option was not invalid ...." *Id.* at 905. Other courts had, however, ruled the option contract unlawful. *See Wall v. Utah Copper Co.,* 70 N.J.Eq. 17, 62 A. 533, 538 (N.J.Ch. 1905) (holding that the "optional character of the contract [at issue] is vicious in itself, and not warranted by that clause in the statute which authorizes the creation and issue of new stock").

intended to ensure that validity.[18] From the origin of the provision, it was worded to authorize the creation and issuance of "rights or options . . . ."[19] Later revisions have not made any changes to the provisions that are relevant to the present issue.[20]

Delaware courts have put various types of transactions within the framework provided by Section 157. One common use of options is to compensate officers, directors, and employees of the corporation. Section 157(c) specifically addresses this use of the option.[21] The Court of Chancery has observed that "stock option plans are an acceptable and necessary means by which corporations gain the services of new employees and retain the services of valued employees."[22] The Grimes agreement is not, however, an option.

This Court has also found the authority to adopt a shareholders' rights plan within Section 157. In *Moran v. Household International, Inc.*,[23] the appellants argued that Section 157 was merely a "corporate financing" statute.[24] We declined to so limit Section 157,[25] noting that the General Assembly did not expressly limit Section 157 to such a purpose. We observed that " 'corporate law is not static,' " but " 'must grow and develop in response to, indeed in anticipation of, evolving concepts and needs.' "[26]

■ In arguing that this transaction did not bestow upon Grimes a "right," Grimes cites commentary that defines an option by "the right of the optionee to buy or not to buy at the optionee's election."[27] Section 157, however, does not concern only "options." It also concerns "rights." Thus options and rights in Section 157 must have two different meanings. This Court will avoid interpreting terms as mere surplusage.[28] The term "right" has a plain English meaning that is broader than the term "option." A right is "[s]omething that is due to a person by just claim [that is] legally enforceable" according to one dictionary definition;[29] an option is more narrowly focused, requiring the power of choice.[30] Thus, even if the power to choose the time of exercise is an integral component of an "option," by including the

---

**18.** R. Franklin Balotti & Jesse A. Finkelstein, Delaware Law of Corporation & Business Organizations § 5.17, at 5–36 (3d ed. 1998) (2002 supplement).

**19.** 36 *Del. Laws*, c. 135, § 6 (1929).

**20.** *See* 56 *Del. Laws*, c. 50, § 157 (1967) (giving the provision its own section); 73 *Del. Laws* c. 81, §§ 4–7 (2001) (giving the provision four subsections, authorizing the directors to determine the option price via formula, and adding a provision dealing with the distribution of rights or options to directors and employees of the corporation).

**21.** *See* 8 *Del. C.* § 157(c) (allowing the board of directors to "designate officers and employees of the corporation . . . to be recipients of such rights or options created by the corporation").

**22.** *Michelson v. Duncan,* 386 A.2d 1144, 1150 (Del.Ch. 1978).

**23.** 500 A.2d 1346 (Del. 1985).

**24.** *Id.* at 1351.

**25.** *Id.*

**26.** *Id.* (quoting *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946 (Del. 1985)).

**27.** 11 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations § 5575 (perm. ed., rev. vol. 2001).

**28.** *U.S. Fidelity & Guar. Co. v. Neighbors,* 421 A.2d 888, 891–92 (Del. 1980).

**29.** Black's Law Dictionary 1322 (7th ed. 1999).

**30.** *Id.* at 1011 (defining "option" as "the right or power to choose").

term "rights" in Section 157 the drafters of that statute presumably intended for other transactions to be included.

In a similar vein, Grimes argues that the term "rights" includes only options or option-like transactions. We rejected this argument in *Moran.* In that case, the appellants argued that a shareholder rights plan was not permitted under Section 157, labeling Section 157 as merely "a corporate financing statute ...."[31] This Court, however, refused "to impose such a limitation upon the section that the legislature has not."[32]

Alteon urges us to adopt a definition of "right," as a "legally enforceable claim that another will do or will not do a given act ...."[33] Grimes responds that this broad definition of right logically includes any transaction that includes as a component an obligation to sell. We need not decide that such a broad definition is appropriate. Accordingly we express no opinion whether the term "rights" would include, for example, an executory stock purchase or a subscription. Even at the time Section 157 was first enacted, in 1929, there were provisions governing both types of transactions.[34] When interpreting provisions dealing with a series of discrete transactions, it is reasonable that this Court will not interpret one provision to overlap others without some indication that the legislature intended such treatment.[35] We therefore do not decide anything beyond the narrow issue presented here: Is the agreement that Grimes relies on to pur-

chase 10% of a future stock offering a "right" under Section 157? We agree with the Court of Chancery that it is, and we expressly do not go beyond that holding to define "rights" under Section 157 any more broadly or for any other purpose.

Grimes' argument on appeal is based on the contention that his transaction does not fall within any of the categories the Delaware General Corporation Law has created for stock transactions, such as "purchase" or "subscription." If the transaction is not a "subscription," a "purchase," or any other commonly-known type of transaction involving stock, it does not follow that it is valid under the General Corporation Law. We cannot conclude that the General Assembly intended that the use of the broad term "rights" in Section 157 would have such a cramped meaning that it would exclude the Grimes transaction. Accordingly, we conclude that an agreement, like the one in question here, is a "right" under Section 157 if it purports to grant the obligee (Grimes) the ability to require the obligor (Alteon) to issue 10% of a stock offering to the obligee—even though the corporation's obligation is conditioned upon the correlative duty on the part of the obligee to buy 10% of the offering.

▮ This reading of Section 157, to require all stock transactions not specifically dealt with in other provisions of the Corporation Law to require board approval under Section 157, serves two complementary purposes that Delaware Courts

---

**31.** 500 A.2d at 1352.

**32.** *Id.*

**33.** Black's Law Dictionary 1322 (7th ed. 1999).

**34.** *See* 36 *Del. Laws,* c. 135, § 6 (1929) (referring to "[s]ubscriptions to, or the purchase price of, the capital stock of any corporation" and requiring the issuance of shares "for such

consideration as may be fixed from time to time by the Board of Directors thereof").

**35.** *See* 2A Norman J. Singer, Sutherland on Statutory Construction § 46:05 (2000) ("[E]ach part or section [of a statute] should be construed in connection with every other part or section so as to produce a harmonious whole.").

have found in the statutory scheme of our Corporation Law. The first is that the corporation should have the freedom to enter into new and different forms of transactions.[36] Indeed, that was exactly the purpose for which Section 157 was originally created. The second is that, to the extent such transactions obligate the board concerning stock issuance, the board must approve them in writing. Certainty in investor expectations emphasizes the need for written board approval of any such transaction. Grimes' contention that his transaction, because of its sui generis nature, need not receive board approval does not comport with this policy.

### Conclusion

We agree with the conclusion of the Court of Chancery that the Grimes agreement is unenforceable for lack of both board approval and a written agreement. One must read together the various statutes in Subchapter V, particularly Sections 152 and 157, because the statutory scheme of the Delaware General Corporation Law requires board approval and a written instrument evidencing an agreement obligating the corporation to issue stock either unconditionally or conditionally.

Accordingly, we affirm the judgment of the Court of Chancery.

---

**36.** *Cf. Rothschild Int'l Corp. v. Liggett Group, Inc.,* 474 A.2d 133, 136 (Del. 1984) (concerning the doctrine of independent legal significance); *Smith v. Van Gorkom,* 488 A.2d 858, 873 (Del. 1984) ("The business judgment rule exists to protect and promote the full and free exercise of the managerial power granted to Delaware directors.").